TIM THOMPSON, INC., *et al.*, Plaintiffs-Appellants, v. THE VILLAGE OF HINSDALE *et al.*, Defendants-Appellees (Presidents and Fellows of Harvard College, Defendant).

Second District   No. 2—92—1166

Opinion filed July 15, 1993.

Michael L. Childress, of Tenney & Bentley, of Chicago (Edward Eshoo, Jr., of counsel), for appellants.

Martin G. Durkin, Jr., and Thomas R. Woodrow, both of Burke, Bosselman & Weaver, of Chicago (Clifford L. Weaver, of counsel), for appellee Village of Hinsdale.

Mitchell A. Orpett, of Tribler & Orpett, P.C., of Chicago (Michael J. Meyer, of counsel), for appellees Re/Max Elite and Gail Norman.

JUSTICE DOYLE delivered the opinion of the court:

Plaintiffs, Tim Thompson, Inc., and Harris Bank Hinsdale, as trustee under trust agreement dated June 16, 1983, and known as trust No. L—669 (hereinafter referred to collectively as Thompson), filed a three-count complaint in the circuit court of Du Page County against defendant Village of Hinsdale (Hinsdale) seeking, *inter alia*, to enjoin the enforcement of a local zoning ordinance and a declaration of its invalidity. Thompson subsequently amended its complaint twice adding RE/MAX Elite, Gail Norman, and the Presidents and Fellows of Harvard College (Harvard) as additional defendants and raising additional theories of recovery. Thompson appeals from the orders of the circuit court granting summary judgment in favor of Hinsdale on four counts and dismissing two additional counts. Thompson further appeals from an order entered granting judgment on the pleadings in favor of Gail Norman and RE/MAX Elite. Harvard is not a party to this appeal. The various orders appealed from contain the requisite Supreme Court Rule 304(a) language (134 Ill. 2d R. 304(a)).

Thompson raises the following issues on appeal: (1) whether the trial court properly entered summary judgment in favor of Hinsdale on counts I and V where Thompson contends that it overcame the presumption of validity which attaches to the enactment of a local zoning ordinance; (2) whether the trial court erred in granting summary judgment in favor of Hinsdale on count II thus denying Thompson's request for injunctive relief; (3) whether the trial court erred in denying Thompson's equitable estoppel claim for declaratory relief; (4) whether count IV stated a legally cognizable claim for relief under the municipal zoning enabling statute; (5) whether count VI stated a cause of action for inverse condemnation; and (6) whether the trial court

erred in entering judgment on the pleadings in favor of Norman and RE/MAX Elite on counts IX and X in the face of Thompson's contention that a question of fact existed relative to Thompson's claim for negligent misrepresentation. Because of the number of issues raised and the variety of procedural devices employed, we will initially present only a brief overview of the facts. As each issue is analyzed, relevant supplemental facts will be introduced.

Norman Hill is a seven-lot residential subdivision located in Hinsdale, Illinois. It is bounded on the west by Washington Street, on the north by Birchwood Avenue, and on the south by Ogden Road. On the east side, Norman Hill is abutted by another residential development. Located in the northernmost one-third of Norman Hill, and orientated along a north-south axis, are lots 5, 6 and 7. Lot 5 has an area of 15,161 square feet; lot 6 has an area of 12,500 square feet; and lot 7 has an area of 12,951 square feet. West of Washington Street is the Merrillwood subdivision. Merrillwood is a single-family residential development with an average lot size of approximately 20,000 square feet. North of Birchwood Avenue and east and west of Washington Street is the Glendale subdivision with an average lot size of approximately 12,750 square feet. Abutting Norman Hill to the east is the LeRay subdivision with an average lot size of slightly over 10,000 square feet. Located to the south of lots 5, 6 and 7 are the remaining Norman Hill lots, none of which were owned by Thompson. Prior to April 25, 1989, Norman Hill was zoned "A," which required a minimum lot size of 10,000 square feet. LeRay, the subdivision to the east, was likewise zoned "A." Merrillwood, the subdivision to the west, was zoned "AA," which required a minimum lot size of 20,000 square feet.

THE ORDINANCE

On April 25, 1989, Hinsdale enacted a new zoning code changing its then-existing zoning code classifications. Norman Hill's classification was changed from A to R-2 which, unlike A, required a minimum lot size of 20,000 square feet. If, however, a lot located in the R-2 district was a legal nonconforming lot of record, the zoning code permitted a minimum lot area of 14,000 square feet. The zoning code further permitted, with a variation, an additional 10% reduction in lot size. Accordingly, under the new zoning classification scheme, as it applied to lots 5, 6 and 7, the minimum required lot size for a single-family residence was 12,600 square feet.

The Glendale subdivision to the north and the LeRay subdivision to the east were zoned R-4, which required a minimum lot size of 10,000 square feet. The Merrillwood subdivision to the west was

zoned R-2. The net effect of the zoning code reclassification, therefore, was essentially to maintain the existing lot size requirements, with the exception of the Norman Hill subdivision.

On November 7, 1990, Thompson filed a three-count complaint against Hinsdale seeking declaratory and injunctive relief. Subsequently, Thompson filed a 10-count complaint adding additional causes of action and joining Harvard, RE/MAX Elite and Gail Norman as additional defendants. Following the dismissal of two counts against Hinsdale and leave to amend, plaintiffs filed a second amended complaint which was identical to their first, with the exception of additional factual allegations in their previously dismissed counts.

Plaintiffs' second amended complaint alleged the following facts. On January 17, 1989, the Village of Hinsdale approved the plat of subdivision for the Norman Hill subdivision. At the time of approval, the subdivision conformed to the requirements of the then-existing zoning ordinance. On February 17, 1989, plaintiffs entered into a standard vacant land sales contract whereby Harvard agreed to sell to plaintiffs lots 5, 6 and 7 in the Norman Hill subdivision for a price of $710,000. Under the terms of the contract, Thompson agreed to guarantee an irrevocable letter of credit, issued by Harris, in the amount of $78,162 and payable to Hinsdale to guarantee the installation of certain public improvements at Norman Hill. On March 6, 1989, Harris Bank, as trustee, acquired title to the property.

Following the enactment of the new zoning code by Hinsdale on April 25, 1989, Thompson expended approximately $72,000 to complete subdivision improvement work required by Hinsdale. On or about July 12, 1989, Hinsdale advised Thompson that lot 6 could not be developed and that lot 7 would require a variation prior to development. In October 1989, Thompson's request for a building permit for the construction of a single-family residence on lot 6 was denied because the lot did not meet the minimum lot size required under the new zoning classification. Additionally, notwithstanding Hinsdale's position regarding lots 6 and 7, Hinsdale continued to insist that Thompson complete the required subdivision improvements under the irrevocable letter of credit. On June 1, 1990, Harris applied for a map amendment to rezone lots 5, 6 and 7 from an R-2 to an R-4 zoning classification (10,000 square feet minimum). On July 24, 1990, Hinsdale denied Harris' application.

COUNTS I AND V

The first issue raised on appeal is whether the trial court erred in granting summary judgment in favor of Hinsdale on counts I and V of

Thompson's second amended complaint. Count I sought a declaration that Hinsdale's denial of Harris' application for a map amendment to rezone was arbitrary, capricious, and substantially unrelated to public health, safety, comfort, morals, and welfare and was therefore invalid and void. Additionally, count I prayed for the issuance of a writ of *mandamus* compelling Hinsdale to effect the zoning map amendment. Thompson alleged that the subject lots were suitable for development; that its proposed use was compatible with the zoning and use of abutting and nearby properties; that its use of all three lots as single-family residences will not cause any injury to or depreciation in the value of any other property in the area; and that denial of the application was inconsistent with the underlying policy of the new zoning code, which was to encourage single-family detached residential development. Count V sought a declaration that Hinsdale's action in rezoning the subject lots was arbitrary and capricious and substantially unrelated to public health, safety, comfort, morals, and welfare and was therefore invalid and void.

In response to Thompson's first amended complaint, Hinsdale moved for summary judgment with respect to counts I, II, III and V. As to counts I and V, Hinsdale contended that its amendment of the local zoning ordinance was a proper exercise of its police power and that it was entitled to judgment as a matter of law because plaintiffs could not overcome the presumption of validity accompanying local zoning decisions.

Attached to Hinsdale's motion for summary judgment was the affidavit of the village clerk, Ellen Mooney, establishing the foundation for the attachment of various documents. The attached documents included a copy of the revised zoning code, a copy of the recorded plat of Norman Hill and two publisher's certificates, dated September 1, 1988, and April 6, 1989, evidencing notice of public hearings with regard to the proposed comprehensive zoning code.

Attached to Thompson's response to Hinsdale's motion for summary judgment were the affidavits of Thomas M. Collins, an expert in matters of real estate valuation and zoning, James H. Bulthuis, a real estate appraiser and consultant, Patrick Coveny, a former executive with Thompson, and Donald G. Eddy, a professional engineer. In his affidavit, Collins opined that Hinsdale's rezoning of the subject lots and its denial of plaintiffs' request for a map amendment were arbitrary, capricious, and substantially unrelated to the health, safety, morals, and general welfare of the community. Collins premised his opinion on, among other things, that the suitability of the subject lots for development with a single-family residence on each lot was firmly

established with no changes in land-use patterns in the immediate area dictating a change in zoning. Collins further stated that there was no need or residual gain to the community by reducing the buildability of single-family residences on the subject lots from three homes to two. Collins further opined that single-family residential development was the highest and best use of the three lots based upon the character of the neighborhood and present land use patterns, and the lack of adverse impact on the adjacent areas.

Additionally, Collins stated that if the zoning were to allow the construction of three residences as opposed to two, the combined value of the subject lots would be $977,397. If only two residences could be developed on lots 5 and 7, the resultant value would be only $812,240. Collins concluded that Hinsdale's actions in rezoning the subject lots from A to R-2 and the denial of Harris' application for a map amendment resulted in a diminution in value of $165,157. Attached as an exhibit to Collins' affidavit was a copy of his formal report and contained therein was a list of vacant land sales in the Hinsdale community.

Thompson also attached the affidavit of James H. Bulthuis, a real estate appraiser and consultant. Bulthuis averred that he was engaged by Harris to appraise the subject lots and that, prior to formulating an opinion, he reviewed the plat of Norman Hill, land surveys, floodplain maps, and the revised Hinsdale zoning code. He determined that single-family residences could be built only on two of the three lots and that, prior to formulating an opinion as to the market value of the two buildable lots, he considered sales of four comparable lots in Hinsdale. Attached to his affidavit was a copy of a land appraisal report evaluating four properties. Bulthuis opined that, based upon his experience as a real estate appraiser, the market value of lots 5, 6 and 7 "if only two lots are buildable is $350,000." Somewhat contrary to the statement in his affidavit, Bulthuis stated in the report that the two "buildable" sites each had a value of $175,000.

Thompson's primary contention on appeal with respect to counts I and V is that the trial court erred in granting summary judgment in favor of Hinsdale because it overcame the presumption of validity attaching to Hinsdale's zoning action through the introduction of clear and convincing factual evidence in light of the factors enumerated in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, and *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370. Hinsdale responds that the entry of summary judgment was proper because plaintiff did not and cannot proffer clear and convincing evidence that the location of the R-2 boundary was arbitrary and

unreasonable, that the application of the *La Salle/Sinclair* factors supports the conclusion that the R-2 classification was reasonable as a matter of law, and that, after considering a full presentation of all the evidence Thompson could muster, the trial court properly determined that Thompson lacked sufficient evidence to prevail on counts I and V of their complaint. Defendants do not indicate how they know that Thompson presented all the evidence it could muster.

In appeals from summary judgment, we conduct a *de novo* review. (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 102.) Summary judgment should be granted when the pleadings, depositions and affidavits on file clearly show that no issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. (735 ILCS 5/2—1005(c) (West 1992).) While summary judgment is encouraged as an aid to the expeditious disposition of a lawsuit, it is nevertheless a drastic means of terminating litigation and should be granted only where the right of the movant is clear and free from doubt. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.

At the outset we question how the parties have framed the issue with respect to counts I and V. Explicit in both parties' contentions is the notion that, in order for it to prevail at the summary judgment stage, Thompson was required to prove its case by the requisite quantum of proof, *i.e.*, clear and convincing evidence. Contrary to the parties' contentions, Thompson was not required to prove its case (see *Keating v. Dominick's Finer Foods, Inc.* (1992), 224 Ill. App. 3d 981, 987); rather, the express purpose of the summary judgment motion was to test for the existence of any triable issues of material fact (see *Purtill*, 111 Ill. 2d at 240). Where a defendant moves for summary judgment properly supported with evidentiary facts demonstrating that no issue of material fact exists, the burden shifts to the plaintiff to come forward with evidence demonstrating that a triable issue of fact exists. In order to prevent the entry of summary judgment in favor of the movant, the nonmoving party must present some factual basis that would arguably entitle him or her to a judgment under the applicable law. (*Keating*, 224 Ill. App. 3d at 987.) Accordingly, where the nonmoving party is under no obligation to prove its case, it logically follows that the standard of proof cannot be operative. (*Cf. Medina v. Air-Mite Devices, Inc.* (1987), 161 Ill. App. 3d 502, 509 ("manifest weight of the evidence is only supportive of a determination that has been made by the trier of fact, but has no bearing to summary judgment").) Moreover, if the standard of proof were operative at the summary judgment stage, the trial court's inquiry would necessarily

encompass weighing evidence and making determinations of credibility. At the summary judgment stage, however, it is not the trial court's function to resolve questions of credibility (*Andersen v. Koss* (1988), 173 Ill. App. 3d 872, 876; *Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 487) or to weigh and appraise evidence (*Fletcher v. Boxx* (1973), 10 Ill. App. 3d 928, 931). The question properly before the trial, therefore, was not whether Thompson overcame the presumptive validity of the revised Hinsdale zoning ordinance through the presentation of clear and convincing evidence; rather, the question is more narrowly confined to whether a genuine issue of material fact existed which bore on the ultimate issue of whether Hinsdale, in its enactment of the ordinance and subsequent denial of the map amendment, acted in a manner that was arbitrary, capricious and substantially unrelated to the public health, safety, comfort, morals, and welfare.

It is well established that zoning ordinances carry a presumption of validity, and the party challenging the presumption carries the burden of establishing by clear and convincing evidence that, with respect to the particular property in question, the ordinance is arbitrary, capricious, and unreasonable and bears no reasonable relation to the public health, safety or general welfare. (*Hamann v. Sumichrast* (1991), 222 Ill. App. 3d 962, 976; accord *La Salle National Bank*, 12 Ill. 2d at 46; *La Grange State Bank v. Village of Glen Ellyn* (1992), 227 Ill. App. 3d 308, 316.) In determining the validity of a zoning ordinance, eight factors ordinarily are taken into consideration: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished; (3) the extent to which the destruction of property value of the plaintiff promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public as opposed to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; (6) the length of time the property has been vacant as zoned considered in the context of land development in the area; (7) the care with which a community has undertaken to plan its land-use development; and (8) the evidence, or lack of evidence, of community need for the use proposed by the plaintiff. (*Hamann*, 222 Ill. App. 3d at 976; see also *La Salle*, 12 Ill. 2d at 46-47 (reciting factors 1 to 6); *Sinclair*, 19 Ill. 2d at 378 (recognizing factors 7 to 8).) The list of factors is not exclusive; no one factor controls, and validity is to be determined on the facts and circumstances of each ordinance. *Rodriguez v. Henderson* (1991), 217 Ill. App. 3d 1024, 1029.

Counts I and V of plaintiffs' second amended complaint alleged, in part, that the subject lots were suitable for development with a single-family residence each and would be compatible with the zoning, use and development of abutting and nearby properties; that plaintiffs' proposed use would not cause any injury to or depreciation in the value of any other property in the area; and that Hinsdale's denial of the map amendment was inconsistent with the purposes, goals, and objectives of the new zoning code, which, in part, was to encourage single-family detached residential development. Count V, which referred to Hinsdale's enactment of the ordinance, raised essentially the same allegations as count I and further alleged that the change from A to R-2 zoning was inconsistent with the zoning, use and character of the surrounding and abutting properties.

Although no one factor is considered controlling, courts have treated the existing use and character of nearby property as being of paramount importance. (*La Salle*, 12 Ill. 2d at 47; *Hamann*, 222 Ill. App. 3d at 976.) It is undisputed that the revised zoning ordinance moved the boundary of the prior A (now R-2) zoning from Washington Street to the eastern edge of the Norman Hill (the side abutting the LeRay subdivision). Additionally, the residential character of the entire neighborhood and the prior and existing zoning of the various surrounding subdivisions was not disputed by the parties. The parties, however, draw diametrically opposed inferences as to the compatibility of the earlier and newly existing schemes as applied to the subject lots.

In support of its motion for summary judgment, defendants proffered the various documents mentioned above in support of their contention that the facts as presented lead to the single reasonable inference that the newly enacted R-2 zoning was compatible with the existing use and scheme of the area. Additionally, in their brief on appeal, Hinsdale appended two maps depicting the prior and newly enacted zoning schemes. Hinsdale expressly refers to these maps and requests that this court see for itself that Thompson's proposed zoning cannot be considered as compatible with the existing scheme.

■ In response to defendants' motion, Thompson, as detailed above, attached affidavits of its experts in support of its contention that the urged for R-4 zoning was compatible and consistent with the existing use and character of the surrounding property. It is apparent from these contentions that Hinsdale looks to the west (toward Merrillwood) and to the south (toward the remainder of Norman Hill) of the subject lots in support of its argument. In contrast, Thompson looks to the east and the north of the subject lots in support of its

contention. In sum, the parties seek to place before this court an issue of material fact based upon differing inferences arising from the undisputed facts, which by their nature require determinations of credibility and appraisal and weighing of evidence. Where reasonable persons could draw divergent inferences from the undisputed facts, summary judgment should be denied. (*Outboard Marine*, 154 Ill. 2d at 102.) Moreover, as stated above, determinations of credibility and weighing of evidence is inappropriate at the summary judgment stage. Accordingly, we reverse the order of the trial court granting summary judgment in favor of defendants as to counts I and V and remand for further proceedings.

It is expressly noted, however, that we offer no opinion as to whether the facts averred by Thompson could sustain its substantial burden of overcoming, by clear and convincing evidence, the presumptive validity of the newly enacted zoning ordinance. Our determination is limited to holding only that an issue necessary for resolution by the trier of fact was presented at the summary judgment stage. Additionally, because of our determination, it is unnecessary to reach Thompson's further contention that Hinsdale's failure to introduce expert testimony on the *La Salle/Sinclair* factors should have compelled the court to deny defendant's motion.

COUNT II

The next issue is whether the trial court erred in entering summary judgment in favor of Hinsdale on count II of Thompson's complaint. Count II sought to enjoin Hinsdale from enforcing the provisions of the revised zoning code as it related to the subject lots and further sought the issuance of mandatory injunctive relief compelling Hinsdale to "rescind, repeal, or otherwise invalidate any previous actions taken that preclude plaintiffs' " use of the lots for development of single-family residences.

An injunction is an extraordinary remedy which is only granted after the plaintiff establishes the existence of a lawful right, irreparable harm, and an inadequate remedy at law. (*Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 115; *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937.) The right sought to be protected must be certain and clearly ascertainable. (*Wilson*, 112 Ill. App. 3d at 937.) Moreover, mandatory injunctions are not favored by the courts and are issued only when the court determines that the urgency of the situation necessitates such action. *Sadat*, 104 Ill. 2d at 116.

The only issue disputed by the parties is whether Thompson had a clear and protectable interest in the continued existence of the prior "A" zoning classification. Thompson contends that, based upon the totality of the circumstances, it had a clear and protectable interest in the continuation of this prior, less restrictive zoning. Specifically, Thompson argues that Hinsdale's failure to inform Don Eddy, a consulting engineer, that a zoning change was forthcoming, Thompson's substantial financial commitment, the issuance of an irrevocable letter of credit to finance public improvements, and its reliance on the probability of the issuance of building permits demonstrated the existence of its vested interest. In support of its contentions, Thompson relies solely on *Industrial National Mortgage Co. v. City of Chicago* (1981), 95 Ill. App. 3d 666.

In *National Mortgage*, the plaintiffs sought to enjoin the defendant city from enforcing the provisions of a revised zoning ordinance enacted after plaintiffs had acquired the subject property, paid for public improvements, and expended substantial sums of money for additional land acquisition, surveys, appraisals, and professional services. On appeal, the court affirmed the trial court's grant of permanent injunctive relief in favor of the plaintiffs, in part, on the grounds that they substantially changed their position in reliance on the prior ordinance and that the substantial expenditures were made *prior to notice of a proposed change in zoning* and before the amendatory ordinance was introduced in the city council. 95 Ill. App. 3d at 670-71.

In *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, our supreme court held that the trial court properly ordered a writ of *mandamus* in favor of the plaintiff based upon its vested right in a prior zoning classification that arose due to a substantial change in position based upon the probability of the issuance of a building permit. (71 Ill. 2d at 523-24.) In *Pioneer* the plaintiffs had gained an earlier approval of their application for a legal nonconforming use, they were issued building permits for the development of prototypes, and incurred expenditures for professional services and the construction of the prototypes. The court noted the general rule that although a property owner has no right in the continuation of a zoning classification, an exception exists where one has substantially changed its position in reliance upon the probability of the issuance of a building permit under a prior existing zoning classification. *Pioneer*, 71 Ill. 2d at 517.

■ Although the procedural and factual posture of *Pioneer* differs, we find it instructive as applied to the present case, and when considered together with *National Mortgage*, the rule emerges that a

plaintiff acquires a right in the continuation of a prior zoning classification where it substantially changes its position in good-faith reliance on the prior classification and the probability of the issuance of building permits, and does so without notice of the proposed zoning change. *National Mortgage*, 95 Ill. App. 3d at 670-71.

■ In the present case, the undisputed facts established that on August 31, 1988, a public notice was published that a hearing on the proposed comprehensive zoning code by the plan commission of Hinsdale was to be held on September 19, 1988. The August 31, 1988, publication expressly stated that notice was being given that a public hearing would be held for the purpose of considering the repeal of the Hinsdale zoning ordinance and map, as amended, and the replacement of same with a new zoning code and map. The notice further provided that the proposed change may affect the zoning classification and use of any or all property in Hinsdale and will affect the zoning provisions applicable to all properties. This notice was required under section 11—13—2 of the Illinois Municipal Code for the adoption of zoning ordinances. (See 65 ILCS 5/11—13—2 (West 1992).) Thompson did not dispute the legal sufficiency of the notice, nor does anything in the record suggest that the hearing did not proceed as scheduled. The uncontroverted facts established that the expenditures made by Thompson were after the August 31 publication date established by the publisher's certificate. Even assuming for the sake of argument that any expenses incurred by Thompson were substantial, the fact is that they were made with constructive notice of the proposed comprehensive zoning code. Moreover, although not dispositive, the majority of expenditures incurred by Thompson followed not only further notice of an additional meeting, but also the enactment of the amended zoning code on April 25, 1989. Therefore, by having notice of the proposed zoning change prior to incurring any obligations, Thompson failed to establish a vested interest in the continuation of the prior zoning classification. Moreover, we are unpersuaded by the suggestion that the earlier approval of the plat of subdivision, in itself, was sufficient to vest Thompson with a right in the prior zoning classification. (See *Weber v. Village of Skokie* (1968), 92 Ill. App. 2d 355, 361.) Accordingly, because the record reveals that no issue of material fact existed as to whether Thompson substantially changed its position in reliance on the prior zoning classification or the probability of the issuance of building permits without, at least, constructive notice of the proposed zoning change, the trial court properly granted summary judgment in favor of Hinsdale on count II of Thompson's complaint.

COUNT III

The next issue is whether the trial court erred in granting summary judgment in favor of Hinsdale on count III, which was premised on a theory of equitable estoppel and sought a declaration that rezoning the subject lots from A to R-2 was void. Count III alleged, in part, that Thompson had no knowledge that the subject lots were going to be rezoned; that its purchase of the lots was made in reliance upon Hinsdale's prior approval of the plat of subdivision; and that it expended approximately $78,000 and installed improvements demanded by Hinsdale in justifiable reliance upon the previously approved plat.

In an affidavit attached to Thompson's response to Hinsdale's motion for summary judgment, Patrick Coveny, an executive-level employee of Thompson's from 1985 through 1991, averred that at the time Thompson entered into the contract for sale with Harvard (February 9, 1989), Thompson agreed to apply for an irrevocable letter of credit, issued by Harris, in the amount of $78,162 payable to Hinsdale, to guarantee the installation of public improvements, which were required by Hinsdale prior to the issuance of building permits for the construction of single-family residences on any of the subject lots.

Coveny further averred that on March 10, 1989, the irrevocable letter of credit, at the request of Hinsdale, was amended to include Thompson as an applicant along with Richard Norman, the original owner of Norman Hill. As a result of the amendment, Harris took $78,162 from Thompson's account and placed it in escrow. Consequently, Thompson did not have access to any of the money until Hinsdale approved specific portions of the construction and installation of the required improvements to the Norman Hill subdivision.

Additionally, Coveny stated that prior to July 12, 1989, the date he and Thompson were informed by Hinsdale that lot 6 was unbuildable and that lot 7 could only be developed with a variation, neither he nor Mr. Tim Thompson, president of Thompson, had knowledge that lots 5, 6 and 7 were going to be rezoned and that they were never advised of the same by Hinsdale.

Donald G. Eddy, a professional engineer retained by Richard Norman on or about June 7, 1989, averred in an affidavit attached to Thompson's response to Hinsdale's motion for summary judgment that during 1988 he met with the Hinsdale Plan Commission (HPC) the Hinsdale Zoning and Public Safety Committee (ZPS) and attended a public hearing in connection with the preparation and approval of the plat of subdivision of Norman Hill. On January 17, 1989, the Hins-

dale Board of Trustees (Board) approved the final plat. Eddy further averred that at no time prior to April 25, 1989, was he advised by HPC, ZPS or the board that the zoning classification would be amended to require a minimum lot size of 14,000 square feet. Eddy was subsequently retained by Thompson in April 1989 to render professional services in connection with the construction and installation of the required public improvements to Norman Hill.

As indicated above, attached to Hinsdale's motion for summary judgment were two publishers' certificates certifying that notices of public hearings on the proposed comprehensive zoning code would take place on September 19, 1988, and April 25, 1989. The publication dates of the notices were August 31, 1988, and April 5, 1989, respectively.

Thompson argues that Hinsdale's act of approving the plat of Norman Hill and requiring it to submit an irrevocable letter of credit to assure the construction and installation of public improvements encouraged and misled Thompson, which reasonably relied to its detriment on the probability that building permits for all three lots would be issued. Hinsdale responds that Thompson had actual and constructive knowledge of the proposed zoning prior to incurring any obligations; that Thompson failed to allege or prove any affirmative act upon which to base its claim; and that reliance on the letter of credit does not support Thompson's estoppel claim.

Equitable estoppel is a doctrine developed in equity to prevent a party from asserting rights where the assertion of those rights would work a fraud or injustice. (*Board of Trustees of the Addison Fire Protection District No. 1 Pension Fund v. Stamp* (1993), 241 Ill. App. 3d 873, 879.) In Illinois, the doctrine of equitable estoppel is applicable to municipal corporations. (*Kenny Construction Co. v. Metropolitan Sanitary District* (1971), 52 Ill. 2d 187, 197; *Gregory v. City of Wheaton* (1961), 23 Ill. 2d 402, 408; *Haeflinger v. City of Wood Dale* (1984), 129 Ill. App. 3d 674, 677.) Where the doctrine is to be invoked against a governmental body acting in the exercise of its governmental functions, particularly those relating to public revenues, estoppel should lie in only extraordinary (*Haeflinger*, 129 Ill. App. 3d at 677) or compelling circumstances (*Stamp*, 241 Ill. App. 3d at 879).

Generally, the party seeking to claim the benefit of the principle must have relied upon the actions or representations of the other and must have had no knowledge or convenient means of knowing the true facts. (*Levin v. Civil Service Comm'n* (1972), 52 Ill. 2d 516, 524.) A party seeking to invoke the doctrine of equitable estoppel against a municipality must establish (1) an affirmative act on the part of the

municipality; (2) that the affirmative act induced the complained-of action; and (3) that it substantially changed its position as a result of its *justifiable reliance*. (*Haeflinger*, 129 Ill. App. 3d at 677.) The affirmative acts which induce reliance must be the acts of the municipality, such as legislation, and not merely the unauthorized acts of a ministerial officer. *Central Transport, Inc. v. Village of Hillside* (1991), 210 Ill. App. 3d 499, 515.

◼ Because the trial court disposed of count III on defendant's summary judgment, the question before this court is whether the pleadings, affidavits, and additional supplemental materials properly before the court raised a genuine issue of material fact thus precluding the entry of summary judgment. We hold that the trial court properly granted summary judgment in favor of defendants on count III because no triable issue of fact existed as to whether plaintiffs could have reasonably or justifiably relied on the prior zoning classification where plaintiffs were on notice of the proposed comprehensive rezoning prior to the execution of the contract for the purchase of the subject lots. Thompson has failed to meet its burden of coming forward with evidence sufficient to create a triable issue of fact, which if resolved in Thompson's favor, would arguably entitle it to a judgment under the applicable law. See *Keating v. Dominick's Finer Foods, Inc.* (1992), 224 Ill. App. 3d 981, 987.

It is our opinion that where a party seeks to invoke the doctrine of equitable estoppel, the party cannot be said to have justifiably relied on the conduct of a public entity where that party has made expenditures with knowledge of zoning problems that may later affect its use of the subject property. (*Cf. Beverly Bank v. County of Cook* (1987), 157 Ill. App. 3d 601, 607 (revocation of special use permit and rezoning of subject area).) In its complaint, Thompson alleged that it had no knowledge that the subject lots would be rezoned. The only factual material on this issue, offered in response to defendants' motions, was the affidavit of Patrick Coveny averring that prior to April 25, 1989, neither he nor Thompson was advised by the authorities, or had any knowledge, that the subject lots would be rezoned.

In support of their motion, defendants attached a publisher's certificate of notice dated September 1, 1988, seven months prior to the execution of the vacant land sales contract. Plaintiffs do not dispute that the publication of such a notice was tantamount to placing them on constructive notice, and plaintiffs provided no evidentiary support to controvert the fact that the notices of hearing on the proposed comprehensive zoning appeared in a local publication in accordance with statutory requirements for the publication thereof. Facts con-

tained in an affidavit in support of a motion for summary judgment which are not contradicted by counteraffidavit are taken as true for purposes of the motion. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 241.

Moreover, although Thompson alleged in its complaint that it had no knowledge of proposed zoning code changes prior to its enactment on April 25, 1989, such allegations were insufficient to contradict the exhibits presented by defendants establishing that Thompson was placed on constructive notice of potential zoning changes. As a general proposition, a mere allegation in a complaint will not suffice to overcome the specific contrary averments of an affidavit, and the mere discrepancy between the two will not raise an issue of material fact. (See *Dakovitz v. Arrow Road Construction Co.* (1975), 26 Ill. App. 3d 56, 59.) Here, while Thompson's complaint alleged lack of knowledge, its complaint contained no allegations to even raise the possibility of a challenge to the averments of constructive notice raised by Hinsdale. Additionally, Coveny's averment as to Timothy Thompson's lack of knowledge of the proposed zoning changes prior to the enactment of the April 25, 1989, ordinance would be inadmissible at trial (see generally R. Hunter, Trial Handbook for Illinois Lawyers—Civil §26.10, at 307-08 (6th ed. 1989)) and thus improper for consideration at summary judgment (see *Kaplan v. Disera* (1990), 199 Ill. App. 3d 1093, 1096). Any expenditures incurred, including the irrevocable letter of credit, were made with notice of potential zoning changes. We are unable to conclude, therefore, that plaintiffs raised a factual issue of their reasonable or justifiable reliance on the prior zoning classification, where the uncontroverted facts established that plaintiffs were on constructive notice of potential problems with the zoning of the subject lots. Accordingly, we hold that the trial court properly concluded as a matter of law that defendants were entitled to summary judgment in their favor on count III of Thompson's complaint. Finally, because our disposition is independent of any reference to a supplemental affidavit of Ellen Mooney and an affidavit of Bohdan Proczko, which were submitted as part of Hinsdale's supplemental materials in support of its motion, it is unnecessary to consider Thompson's further contention that the trial court erred in denying its motion to strike the additional affidavits.

## COUNTS IV AND VI

Thompson's next two contentions on appeal challenge whether the trial court properly dismissed counts IV and VI of its second amended complaint pursuant to section 2—615 of the Civil Practice Law (735 ILCS 5/2—615 (West 1992)). It is well established that the court must

accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom. (*Kolegas v. Heftel Broadcasting Corp.* (1992), 154 Ill. 2d 1, 9.) A section 2—615 motion attacks the legal sufficiency of a complaint. (*Kolegas,* 154 Ill. 2d at 8.) Its purpose is not to raise affirmative defenses but alleges only defects on the face of the complaint. (*Kolegas,* 154 Ill. 2d at 8.) The question presented by a motion to dismiss for failure to state a cause of action is whether sufficient facts are contained in the pleadings which, if established, could entitle the plaintiff to relief. (*Kolegas,* 154 Ill. 2d at 9.) In making such a determination, the court is to interpret the allegations of the complaint in the light most favorable to the plaintiff. *Kolegas,* 154 Ill. 2d at 9.

Thompson contends that the trial court erred in determining that count IV failed to allege a legally cognizable claim for relief. Count IV sought a declaration that Hinsdale's rezoning lots 6 and 7 was violative of section 11—13—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1989, ch. 24, par. 11—13—1 (now codified, as amended, at 65 ILCS 5/ 11—13—1 (West 1992))) and was therefore void and invalid. Count IV alleged, in relevant part, that Hinsdale's action in rezoning the subject lots was in violation of the statute because it deprived plaintiffs of using lots 6 and 7 for the lawful purpose of developing single-family residences. On January 17, 1989, Hinsdale approved the Norman Hill plat of subdivision, and, at the time of approval, the subdivision conformed to the then-existing zoning classification. Thompson alleged that it purchased the subject lots with the intent to build single-family residences and the lots would not have been purchased if single-family residences could not be built on each of the three lots. Following Thompson's purchase of the subject lots, Hinsdale requested that an irrevocable letter of credit issued to Richard Norman, the original subdivision owner, be amended to include Thompson as an applicant. As a result of the amendment, Harris transferred $78,162 from Thompson's account and placed it in escrow, thus depriving Thompson of access to those funds until Hinsdale's approval of the construction and installation of various public improvements. Thompson agreed to such an arrangement in reliance on the probability that building permits for the construction of single-family homes would be issued for each of the subject lots. Following the enactment of the new ordinance on April 25, 1989, Thompson expended $99,674.50 to construct and install public improvements.

Thompson argues that its intention to construct single-family residences coupled with its substantial financial commitment entitled it to use the subject lots for the purpose of constructing single-family resi-

dences irrespective of the new zoning code enacted by Hinsdale. Hinsdale responds that section 11—13—1, as a matter of statutory construction, applied only to an existing property that is then lawfully devoted to some use. Hinsdale argues that, at the time the new zoning ordinance was enacted, the subject lots were vacant and not dedicated to any use protectable under section 11—13—1.

Section 11—13—1, as it existed relevant to the action herein, provided, in part:

"The powers conferred by this Division 13 shall not be exercised so as to deprive the owner of any existing property of its use or maintenance for the purpose to which it is then lawfully devoted ***." Ill. Rev. Stat. 1989, ch. 24, par. 11—13—1 (now codified, as amended, at 65 ILCS 5/11—13—1 (West 1992)).

Neither party has cited any authority directly interpreting this provision. Additionally, both parties, in part, dispute the application of *City of Belleville v. Leonard* (1969), 108 Ill. App. 2d 26 (abstract of opinion), to the circumstances of the controversy before the court. We decline to consider an opinion published only in abstract where the analytical basis for the court's decision is not readily discernible.

The primary rule of statutory interpretation is that a court should ascertain and give effect to the intention of the legislature. (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 91.) In determining the legislature's intent, a court must first consider the statutory language itself, as the clear language of the statute is the best indicator of legislative intent (*People v. N L Industries* (1992), 152 Ill. 2d 82, 97), and where the statutory language is clear and certain, a court is limited to enforcing the statute as enacted (*People v. Ramey* (1992), 152 Ill. 2d 41, 65). In its determination of legislative intent, a court may consider the reason and necessity for the law, the evils to be remedied, and the objects to be obtained. (*State Farm Fire & Casualty Co. v. Yapejian* (1992), 152 Ill. 2d 533, 541.) Furthermore, a court construing statutory language will assume that the legislature did not intend to produce an absurd or unjust result. *Yapejian*, 152 Ill. 2d at 541.

■ Section 11—13—1, in its entirety, is what is commonly referred to as an enabling statute. Its overall purpose is to delegate to municipal authorities legislative functions to enact regulations for the purpose of promoting public health, safety and welfare. (*City of Champaign v. Roseman* (1958), 15 Ill. 2d 363, 366.) The exercise of such power, of course, is limited by the constraint that, to be valid, a zoning classification must bear some real and substantial relationship to the public welfare, health and safety. (*Roseman*, 15 Ill. 2d at 366.)

The purpose of the provision pertaining to existing uses is to provide protection for nonconforming uses in existence at the time the zoning ordinance is enacted. (*City of Chicago v. Miller* (1963), 27 Ill. 2d 211, 218.) We are unpersuaded by Thompson's contention that section 11—13—1 is violated where a property owner's intention to develop is coupled with a substantial change in position, thus preventing a municipality from applying a newly enacted ordinance to the property in question. There is nothing in section 11—13—1 to suggest that the legislature intended to codify the doctrine of equitable estoppel. Moreover, reading the statute as whole (*Abrahamson*, 153 Ill. 2d at 91), we interpret section 11—13—1 as evincing a legislative concern that an otherwise lawful exercise of a municipal zoning authority's police powers should not deprive a property owner of its *actual* use, as opposed to its intended or contemplated use, of the property as it existed at the time of the enactment of the zoning ordinance. To assign another meaning, based upon intended as opposed to actual use, to the plain language of that particular provision within section 11—13—1 would undermine, at least to some degree, the fundamental purpose of the enabling statute, which is to allow municipalities relatively unfettered discretion to enact zoning ordinances, subject only to constitutional constraints on the exercise of that power. As correctly pointed out by Hinsdale, if Thompson's position were adopted, no municipality in Illinois could ever effect a change in the zoning classification of vacant property because such a change might interfere with some intended use allowed, but not developed, under the prior zoning. We do not think the legislature intended such a result when it enacted section 11—13—1. Accordingly, we hold that the trial court properly dismissed count IV for failure to state a legally cognizable cause of action under section 11—13—1.

DISMISSAL OF COUNT VI

Thompson next contends that the trial court erred in dismissing count VI of its complaint for failure to state a legally cognizable cause of action for inverse condemnation. Thompson argues that count VI sufficiently alleged a significant interference by Hinsdale with Thompson's investment-backed expectations. Count VI realleged the same factual circumstances underlying count IV, and, for the sake of brevity, it is unnecessary to recite them here. Thompson argues that the rezoning of the subject lots, the subsequent denial of building permits, and Hinsdale's denial of the map amendment denied Thompson economically viable use of lots 6 and 7 and that a landowner need only allege that a zoning classification prohibits the highest, best, and most

profitable use of the landowner's property. Hinsdale responds that Thompson's failure to allege deprivation of all economically viable use of the entire subject property defeats its claim for inverse condemnation.

■ Although count VI of Thompson's complaint alleged violations of both Federal and State constitutional law, Thompson limited its arguments and supporting authority, both here and below, to considerations of Federal constitutional law. Accordingly, any question as to whether count VI stated a cause of action for inverse condemnation under sections 2 and 5 of article I of the Illinois State Constitution is waived on appeal.

■ Inverse condemnation, as distinguished from eminent domain, describes the manner in which a landowner recovers just compensation for a taking of its property when condemnation proceedings have not been instituted. (*United States v. Clarke* (1980), 445 U.S. 253, 257, 63 L. Ed. 2d 373, 377, 100 S. Ct. 1127, 1130.) A land-use regulation, however, does not constitute a taking if it substantially advances legitimate State interests and does not deny an owner economically viable use of its land. (*National Advertising Co. v. Village of Downers Grove* (1990), 204 Ill. App. 3d 499, 512, citing *Nollan. v. California Coastal Comm'n* (1987), 483 U.S. 825, 834, 97 L. Ed. 2d 677, 687, 107 S. Ct. 3141, 3146; see also *St. Lucas Association v. City of Chicago* (1991), 212 Ill. App. 3d 817, 834, quoting *Agins v. Tiburon* (1980), 447 U.S. 255, 260, 65 L. Ed. 2d 106, 112, 100 S. Ct. 2138, 2141.) Moreover, where an ordinance is an otherwise valid exercise of a municipality's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional. (*Goldblatt v. Town of Hempstead* (1962), 369 U.S. 590, 592, 8 L. Ed. 2d 130, 133, 82 S. Ct. 987, 989.) On appeal, Thompson does not challenge Hinsdale's actions on the ground that Hinsdale's actions failed substantially to advance legitimate State interests; rather, Thompson focuses solely on denial of economic viability.

The task of defining what constitutes a taking for Federal constitutional purposes has long been acknowledged "as a problem of considerable difficulty." (*Penn Central Transportation Co. v. City of New York* (1978), 438 U.S. 104, 123, 57 L. Ed. 2d 631, 648, 98 S. Ct. 2646, 2659.) There is "no set formula to determine where regulation ends and taking begins." (*Hempstead*, 369 U.S. at 594, 8 L. Ed. 2d at 134, 82 S. Ct. at 990.) In *Suhadolnik v. City of Springfield* (1989), 184 Ill. App. 3d 155, 180, the Appellate Court, Fourth District, held, relying on *First English Evangelical Lutheran Church v. County of Los Angeles* (1987), 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378, and

*MacDonald, Sommer & Frates v. County of Yolo* (1986), 477 U.S. 340, 91 L. Ed. 2d 285, 106 S. Ct. 2561, that a plaintiff failed to state a cause of action premised upon a regulatory taking theory where the plaintiff did not allege that he was deprived of *all* use of his property. (*Suhadolnik*, 184 Ill. App. 3d at 180-81.) We are unpersuaded by the analysis in *Suhadolnik*.

In *St. Lucas Association* (212 Ill. App. 3d 817), the Appellate Court, First District, relying on *Penn Central*, affirmed the circuit court's denial of the plaintiff landowner's request for just compensation pursuant to the takings clause of the Illinois Constitution (Ill. Const. 1970, art. I, §15). The trial court determined that no taking occurred because the City's denial of a landowner's request for a zoning change "occasioned upon the [landowner] only a diminution in value of the property rather than a denial of 'all economically viable uses.' " After noting that *First English* did not resolve the issue of whether a taking occurred in the case before it, the appellate court underscored the problematic nature of determining when a regulation has "[gone] too far" so as to be deemed a taking. (*St. Lucas Association*, 212 Ill. App. 3d at 833, citing *Pennsylvania Coal Co. v. Mahon* (1922), 260 U.S. 393, 415, 67 L. Ed. 322, 326, 82 S. Ct. 158, 160.) The court went on to state that under *Penn Central* and its progeny a regulatory taking occurred when the regulation " 'denies an owner economically viable use of his land.' " (*St. Lucas Association*, 212 Ill. App. 3d at 834, quoting *Agins v. Tiburon* (1980), 447 U.S. 255, 260, 65 L. Ed. 2d 106, 112, 100 S. Ct. 2138, 2141.) The court ultimately concluded that a regulatory taking did not occur because the ordinance in question allowed the landowner to develop its property in accordance with other permitted uses under the existing zoning classification, although such uses were not of the sort apparently desired by the landowner. (*St. Lucas Association*, 212 Ill. App. 3d at 835.) The court was careful to distinguish the case before it from the situation where an ordinance prohibits an owner from making any use of its property. Accordingly, under *St. Lucas Association* no regulatory taking occurs where an owner may still utilize its property under an economically viable alternative use that is already permitted under the challenged zoning classification, even though the denial of the desired use has occasioned a diminution in the landowner's perceived ultimate value of the property. 212 Ill. App. 3d at 835.

Subsequent to *St. Lucas Association* and *Suhadolnik*, the United States Supreme Court in *Lucas v. South Carolina Coastal Council* (1992), 505 U.S. ___, 120 L. Ed. 2d 798, 112 S. Ct. 2886, undertook to shed some light on the question of determining when a regulation

goes too far so as to constitute a regulatory taking. The court stated that although it had generally eschewed any rigid formula for determining when a land-use regulation is tantamount to a taking, preferring instead to engage in case-by-case factual inquiries (*South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 812, 112 S. Ct. at 2892-93), it identified "two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint." (*South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 812, 112 S. Ct. at 2893.) "The [first category] encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property." (*South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 812, 112 S. Ct. at 2893.) The second category, which is at issue in the present case, is where "regulation denies *all* economically beneficial or productive use of land." (Emphasis added.) See *South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 813, 112 S. Ct. at 2893; see also *St. Lucas Association*, 212 Ill. App. 3d at 834-35.

In its analysis of the second category, the *South Carolina Coastal* court reiterated its oft-expressed belief that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave [its] property idle, [it] has suffered a taking." (Emphasis in original.) (See *South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 815, 112 S. Ct. at 2895.) Contrary to Hinsdale's contention that it is necessary, in order to state a cause of action for inverse condemnation, to allege facts sufficient to show that a landowner has been deprived of *all* economically viable use of its land, we interpret the rule as merely defining a circumstance under which a court would be compelled to find that a regulatory taking has occurred. In our view, the court has not defined some minimum threshold necessary to constitute a regulatory taking; rather, the court has expressed its belief that where a landowner is deprived of all use of its property, a taking has occurred. It is our opinion that the majority in *South Carolina Coastal* envisioned that a situation may exist where a landowner has suffered a deprivation of viable economic use at something less than 100% and yet still be able to establish a regulatory taking.

In support of our interpretation, we note that the majority, in a footnote, was careful to point out that the rule it espoused was not necessarily an all or nothing proposition. (See *South Carolina Coastal*, 505 U.S. at ____ n.8, 120 L. Ed. 2d at 815 n.8, 112 S. Ct. at 2895 n.8.) The majority, responding to criticism of the general rule, stated:

"This analysis errs in its assumption that the landowner whose deprivation is one step short of complete is not entitled to compensation. Such an owner might not be able to claim the benefit of our categorical formulation, but, as we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally. *Penn Central Transportation Co. v. New York City*, 438 US 104, 124, 57 L Ed 2d 631, 98 S Ct 2646 (1978). It is true that in at least *some cases* the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full." (Emphasis in original.) *South Carolina Coastal*, 505 U.S. at ___ n.8, 120 L. Ed. 2d at 815 n.8, 112 S. Ct. at 2895 n.8.

■ Based upon our reading, we conclude that the majority in *South Carolina Coastal* left the question open as to whether a party could state a legally viable regulatory taking claim based upon a deprivation of beneficial economic use that is something less than 100%. The only limitation is that the party seeking relief will be unable to avail itself of the "benefit of the categorical formulation" of the rule. Accordingly, we find Hinsdale's argument unpersuasive and the trial court's reliance thereon misplaced.

Nevertheless, an adequate legal ground exists to sustain the trial court's dismissal of count VI, and it is within the power of this court to sustain the order of the trial court on the basis of any legal grounds which have factual support in the record, even where such grounds were not raised before the trial court (*Sheldon v. Colonial Carbon Co.* (1983), 116 Ill. App. 3d 797, 803; *In re Marriage of Miller* (1982), 108 Ill. App. 3d 63, 66; *Ogden Group, Inc. v. Spivak* (1981), 92 Ill. App. 3d 932, 934). Reading Thompson's complaint as a whole and accepting its well-pleaded facts as true, it is our conclusion that Thompson has failed to allege any substantial deprivation of an economically viable use. Although the zoning regulation enacted by Hinsdale did not permit Thompson to erect three houses on three individual lots as originally platted, the regulation did not in any manner prevent Thompson from developing the property for an economically viable use. Thompson remained free to develop the entire parcel subject only to the newly enacted ordinance. The readily apparent inference that can be drawn from the facts as alleged is that, as zoned under the new regulations, Thompson may not be able to realize as much profit from the development as originally anticipated. Accordingly, rather than alleging a deprivation of economically viable use,

Thompson, in our view, has alleged, at best, nothing more than a diminution in the ultimate value of the entire parcel, *i.e.*, lots 5, 6 and 7 in the aggregate.

In *Penn Central*, the court stated:

> " 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights *in the parcel as a whole*." (Emphasis added.) *Penn Central*, 438 U.S. at 130-31, 57 L. Ed. 2d at 652, 98 S. Ct. at 2662.

Additionally, in response to a petitioners' argument that an aspect of a mining subsidence ordinance, which deprived petitioners of the ability to mine certain areas for coal, was tantamount to an appropriation by the State, the court in *Keystone Bituminous Coal Association v. DeBenedictis* (1987), 480 U.S. 470, 94 L. Ed. 2d 472, 107 S. Ct. 1232, stated:

> "This argument fails for the reason explained in *Penn Central* and *Andrus*. The 27 million tons of coal do not constitute a separate segment of property for takings law purposes. Many zoning ordinances place limits on the property owner's right to make profitable use of some segments of his property. A requirement that a building occupy no more than a specified percentage of the lot on which it is located could be characterized as a taking of the vacant area * * *. Similarly, under petitioners' theory one could always argue that a set-back ordinance requiring that no structure be built within a certain distance from the property line constitutes a taking because the footage represents a distinct segment of property for takings law purposes." 480 U.S. at 498, 94 L. Ed. 2d at 496, 107 S. Ct. at 1248-49.

Under the circumstances of the present case and the allegations as pleaded in its complaint, we choose to view Thompson's property not as three distinct segments, as Thompson would have us do; rather, viewing the subject lots together as an entire parcel, which is supported by the well-pleaded fact in Thompson's complaint that it purchased the entire parcel as a single unit at one time, we conclude as a matter of law that the allegations of Thompson's complaint failed to allege any substantial deprivation of an economically viable use, thus defeating its claim. Because the Hinsdale zoning regulation merely denied Thompson its optimally desired use of the property, and the regulation otherwise allows that landowner an economically viable

use of its property, a regulatory taking has not occurred. Moreover, as a matter of public policy, " '[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.' " (*South Carolina Coastal*, 505 U.S. at ____, 120 L. Ed. 2d at 814, 112 S. Ct. at 2894, quoting *Pennsylvania Coal*, 260 U.S. at 413, 67 L. Ed. at 325, 43 S. Ct. at 159.) Accordingly, the circuit court's dismissal of count VI for failure to state a cause of action for inverse condemnation is affirmed.

DISMISSAL OF COUNTS IX AND X

Thompson's final contention on appeal is directed to the circuit court's entry of judgment on the pleadings in favor of defendants RE/MAX Elite and Gail Norman on counts IX and X. Counts IX and X of Thompson's second amended complaint reallege and incorporate by reference the factual allegations previously recited. Additionally, count IX alleged, *inter alia*, that Norman was the authorized agent of Thompson in connection with its purchase of the subject lots; that Norman assured Thompson that the lots would be capable of being developed with single-family residences; and that Norman breached her duty to exercise reasonable care and competence in "commuting [*sic*]" information intended to guide Thompson in its dealings with third parties. Additionally, Norman's assurances were given in response to specific inquiries "so as to guide the plaintiffs in determining whether to purchase" the subject lots. Count X alleged that during the time of the alleged misrepresentations Norman was acting in the course and scope of her employment with RE/MAX Elite.

Thompson contends that its complaint set forth the essential allegations necessary to plead a cause of action for negligent misrepresentation and that the circuit court erred in granting judgment on the pleadings in favor of Elite and Norman because a question of fact existed as to whether Norman's words—"would be capable of being improved with single-family residences"—referred to the zoning code prior to the April 25, 1989, revision or after. Elite and Norman respond that the pleadings established that Norman's representation, when made, was a true and accurate statement as to the existing zoning; that even if her statement were construed as referring to the future zoning, statements about future or contingent events are not actionable under a negligent misrepresentation theory; and, alternatively, regardless of whether Norman was referring to the present or future code, her statements were representations of law and not of fact.

The purpose of a motion for judgment on the pleadings is to test the sufficiency of the pleadings by determining whether the plaintiff is entitled to the relief sought by its complaint, or, alternatively, whether the defendant by its answer has set up a defense which would entitle it to a hearing on the merits. (*Granville National Bank v. Alleman* (1992), 237 Ill. App. 3d 890, 894.) Under a section 2—615 motion for judgment on the pleadings (735 ILCS 5/2—615 (West 1992)), the trial court must examine all pleadings on file, taking as true the well-pleaded facts, and reasonable inferences to be drawn therefrom, set forth in the opposing party's pleadings. (*Harris Trust & Savings Bank v. Donovan* (1991), 145 Ill. 2d 166, 172.) A judgment on the pleadings is proper only if questions of law and not fact exist after the pleadings have been filed. *Donovan*, 145 Ill. 2d at 172.

■ Taking as true the well-pleaded facts of Thompson's complaint, we hold that Norman was entitled to judgment on the pleadings. The factual allegations of Thompson's complaint established that any alleged misrepresentation made by Norman would have occurred prior to either the date Thompson contracted with Harvard for the purchase of the subject lots (February 17, 1989) or the closing date (March 6, 1989). Thompson's complaint further averred that prior to April 25, 1989, the Hinsdale zoning code permitted the construction of single-family residences on minimum lot sizes of 10,000 square feet. Accordingly, by Thompson's own admission, any representation made by Norman with respect to the zoning code would not have been a false statement. Moreover, Thompson was not entitled to rely upon a representation regarding the existing zoning because both parties were presumed to be equally capable of knowing and interpreting the law. See *Hamming v. Murphy* (1980), 83 Ill. App. 3d 1130, 1135.

Additionally, if we were to assume further that Norman's representation that each of the subject lots would be capable of being improved with single-family residences referred to the proposed zoning regulation, such a statement would nevertheless not be actionable. A false representation must generally relate to an existing or past event, not to a promise or prognostication concerning a future happening. (*Sinclair v. Sullivan Chevrolet Co.* (1964), 31 Ill. 2d 507, 510.) Finally, we note that although Thompson contends that its allegations did not refer to the zoning code, instead they "simply alleged Lots 5, 6 and 7 would be capable of being improved with single-family residences," Thompson urges elsewhere in its brief, as a basis for reversal, that "it is a question of fact as to whether the words 'would be capable of being improved with single-family residences' *referred to Hinsdale's Zoning Code in effect prior to April 25, 1989, as opposed*

*to Hinsdale's new Zoning Code, effective April 25, 1989."* We are unpersuaded by its argument that a question of fact existed to resolve a perceived ambiguity in the language of its complaint, where elsewhere in its brief and at the hearing on the motion Thompson expressly referred to the statement in the context of the prior and newly enacted zoning codes. Accordingly, the circuit court properly dismissed count IX. Additionally, because count X against RE/MAX Elite was premised upon vicarious liability, it too must fail. Therefore, we affirm the circuit court's order granting RE/MAX Elite and Norman's motion for judgment on the pleadings.

For the foregoing reasons, the order of the circuit court of Du Page County granting summary judgment in favor of Hinsdale on counts I and V is reversed, and the cause is remanded to the circuit court; the order granting summary judgment in favor of Hinsdale on counts II and III is affirmed; the order dismissing counts IV and VI is affirmed; and the order granting RE/MAX Elite and Gail Norman's motion for judgment on the pleadings on counts IX and X is affirmed.

Affirmed in part; reversed in part and remanded.

GEIGER and QUETSCH, JJ., concur.