**Bob LUCAS, Plaintiff,**

v.

**VILLAGE OF LA GRANGE, a municipal corporation, Bernard Martin, Jr., Scott Randall, and Marlies Perthel, Defendants.**

No. 92 C 2232.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1993.

1408

John M. Beal, Chicago, IL, for plaintiff.

Kenneth T. Garvey, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Bob Lucas d/b/a La Grange Carpet and Upholstery Company ("Lucas") has brought this 42 U.S.C. § 1983 ("Section 1983") action against the Village of La Grange ("La Grange") and three of its officials: Village Manager Scott Randall ("Randall"); Village Attorney Bernard Martin, Jr. ("Martin") and Building Commissioner Marlies Perthel ("Perthel"). Lucas alleges that he had property and liberty interests in an occupancy certificate, a business license and a sign permit for an upholstery shop in La Grange and that defendants violated his due process, First Amendment [1] and equal protection rights under the United States Constitution, as well as violating the laws of the State of Illinois, when it refused to issue those things to him or to allow him to display certain information on business signs at his establishment.

Each side now moves for partial summary judgment.[2] For the reasons set forth in this memorandum opinion and order, defendants' motion is granted in part and denied in part and Lucas' corresponding motion is denied.

*Facts* [3]

Lucas is an upholsterer who resides in La Grange, where he has operated an upholstery business since 1987. It was in April 1987 that La Grange issued Lucas his first business license to operate under the name "La Grange Carpet and Upholstery" (P. 12(m) ¶ 6). Then in March 1989 Lucas entered into a ten-year lease for the premises at 5 South La Grange Road, which is in the central business district in the main commercial thoroughfare that goes through La Grange (*id.* ¶ 8). La Grange issued an occupancy certificate to Lucas to operate an upholstery shop at that address (*id.* ¶ 9).

Also in 1989 the La Grange Zoning Commission ("Commission") was in the process of preparing a draft of a proposed New Comprehensive Zoning Ordinance. On June 6 of that year La Grange's zoning counsel submitted to the Commission a proposed list of uses for various zoning districts for inclusion in the draft ordinance (D. 12(m) ¶ 5). That proposal was modeled on the Village of Hinsdale's zoning ordinance, which does not permit upholstery and furniture repair in the downtown area. Under the proposed draft, Article V of the new ordinance would set up four different commercial districts (*id.* ¶¶ 6–10):

C–1, a central commercial district, was intended to provide an area in which to

---

1. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

2. Familiar Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this Court has often described as Janus-like—that sometimes involves the denial of both motions.

3. This District Court's General Rule ("GR") 12(m) requires each Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each fact alleged. GR 12(n) requires each nonmoving party to respond point by point, with citations to the record in support of (1) any claimed dispute as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Unfortunately defendants did not adhere to those rules or to the schedule that had been established by this Court's orders (even though that schedule had been set, as this Court always does, only after conferring with counsel as to a realistic timetable). That has led to an irregular set of submissions, which will be cited "P. 12(m) ¶—," "D. 12(m) ¶—" and "P. 12(n) ¶—." Unless otherwise indicated, the use of such a citation indicates that the opposing party has not disputed the assertion. Finally, Exhibits accompanying the parties' submissions are simply cited "P.Ex.—" or "D.Ex.—."

**1410** 

develop a concentrated pedestrian-oriented commercial shopping center. C–1 did not allow upholstery or furniture repair.

C–2, a limited service commercial district, was intended to provide areas in the Burlington–Hillgrove commercial corridor for existing commercial uses.

C–3, a central service commercial district, was intended to provide areas for the development of service, commercial and retail uses that required direct vehicular access.

C–4, a convenience commercial district, was intended to serve the day-to-day shopping and consumer service needs of the local low density residential neighborhoods.

In November 1989 La Grange mailed "The Village Voice," a newsletter, to each resident and business in the village (D. 12(m) ¶ 11). That newsletter gave notice of a public hearing that was to be held on December 4, 1989 concerning the proposed draft of the New Comprehensive Zoning Ordinance. Lucas denies receiving any notice at that time (P. 12(n) ¶ 11). Two newspapers also published notice of the hearing (D. 12(m) ¶ 11), which the Commission held on the scheduled date. No formal action was taken on the proposed ordinance at that time—or indeed for over a year thereafter.

In 1990 Lucas wanted to move his shop to a new corner location next door that he thought would bring in more traffic and give him more space. In August of that year he wrote to La Grange to advise it that he was looking "to expand" his business from 5 South La Grange Road to the location next door at 1 South La Grange Road and that he had begun discussions with his potential landlord (P.Ex. 7). It will be recalled that some eight months had passed since the December 1989 hearing, with no change in the zoning ordinance having been enacted. But in terms of the proposed new ordinance that had been the subject of that hearing, both Lucas' existing location and his proposed new

location were in the contemplated C–1 district.

On November 15, 1990 Lucas applied for a business license, an occupancy certificate and a sign permit for the new 1 South La Grange Road location (P.Ex. 9). Lucas did not receive an immediate response from La Grange, so he sent La Grange a letter pointing out that it had been over two weeks since he had submitted his application and that he intended to vacate the 5 South La Grange Road premises around the first of the year (P.Ex. 11).

On December 14, 1990 Lucas wrote to Randall (P.Ex. 13):

This is the second request we are making to you for our business for 1 South La Grange Road.

You have refused to return my phone calls and refused to give us our license. I was told by your people that due to the new zoning laws that there would be no upholstery shops allowed on La Grange Road when it is adopted.

We have submitted our application on November 15, 1990 (copy attached) in accordance with the existing ordinance, and have signed leases for the space accordingly. We hereby respectfully request that you give us our license immediately.

On that same day Lucas entered into a ten year lease for one half of the first floor and all of the second floor at the new location to begin on February 1, 1991 (P. 12(m) ¶ 13). In accordance with the lease requirements, Lucas then delivered to his landlord security deposits of $3000 and $3,750 on December 19, 1990 and January 7, 1991 respectively (*id.* ¶¶ 13–14).[4]

Lucas then began to hear from La Grange about his application. On January 11, 1991 Thomas Brown ("Brown"), a Code Enforcement Officer, wrote Lucas to reiterate that upholstery would not be allowed in the C–1 district (P.Ex. 15). One week later Brown wrote again to deny the sign permit and

---

**4.** Defendants' response to Lucas' 12(m) ¶ 4 statement purports to "deny" it, but without offering anything to refute it. That is just one example of defendants' apparent basic misunderstanding of the GR 12(m)—12(n) procedure and how it implements Rule 56. Mere "denial" of a GR 12(m) statement that is properly supported by admissible evidence does not place the matter at issue. As in other areas referred to in this opinion, Lucas' factual assertions must therefore be accepted.

occupancy certificate applications, stating that the sign did not meet size specifications and that warehousing and manufacturing, which Lucas had listed as uses, were not permitted in the C–1 district (P.Ex. 16). Brown additionally indicated a number of other asserted deficiencies in the second floor space plan. Just a few days later Lucas also received a letter from Perthel advising him of the procedures for securing a building. permit and telling him to call Building Inspector Chuck Widdel if he had any questions (P.Ex. 17). After receiving Brown's January 18 letter, Lucas filed another set of applications (P. 12(m) ¶ 24).[5]

During that same period La Grange continued to consider the proposed zoning amendments. At a meeting of the La Grange Village Board on or about January 28, 1991, Martin requested deferral of action on Lucas' application for a business license until after La Grange took action on the proposed zoning ordinance (*id.* ¶ 26). Action on Lucas' applications was deferred.

On January 28, 1991 La Grange did in fact adopt the proposed zoning ordinance (P.Ex. 20) and denied Lucas' application for sign permits and an occupancy permit for the ·1 South La Grange Road location (D. 12(m) ¶ 15). On January 31 La Grange granted Lucas an occupancy certificate and license for a sales office at that address but not to do upholstery work. Then on February 25, 1991 Randall notified Lucas that his application for a business license had been denied as "in conflict with the new ordinance" (P.Ex. 20). Finally, Perthel's affidavit says that Lucas was told in January 1992 that La Grange was willing to issue "permits for signs displaying the word 'upholstery'" (D. Ex. 1 ¶ 17).

On February 3, 1992 La Grange issued a violation Notice to Lucas, in part for displaying a business sign that included a telephone number (P.Ex. 23). That charge was ultimately dismissed on the merits by the Circuit Court of Cook County (*id.* Ex. 24).

Lucas would attribute La Grange's actions to a conspiracy against him. Though he fails to set forth its genesis, he suggests that it derived from defendant Martin, who before becoming La Grange Village Attorney had represented another upholsterer in an action against Lucas. That case, which was Martin's sole representation of that client, ceased in 1987 (P. Mem. at 7).

### *Section 1983*

■ Plaintiffs who invoke Section 1983 must make a two-tiered showing: that defendants' "conduct complained of was committed by a person acting under color of state law" and that defendants' "conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States" (*Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981)). Because there is no dispute that all of defendants' actions were taken under color of state law or that La Grange may be held liable under *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), this opinion's discussion is limited to the second inquiry. On that score Lucas claims violations of both procedural and substantive due process as well as of his First Amendment and equal protection rights. Those contentions are addressed in turn.

### *Procedural Due Process*

*New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990) states the basic requirement for all due process claims:

> Before a party may assert a due process argument—procedural or substantive—it must establish that it has a "legitimate claim of entitlement" to the right being asserted.

As for the first type of such claims, *Board of Regents v. Roth,* 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972) explains that "the range of interests protected by procedural due process is not infinite." Instead its protections "apply only to the deprivation of interests encompassed by the Four-

---

**5.** Lucas does not specify whether that filing was made before or after Perthel's letter—but it does

not matter either way.

teenth Amendment's protection of liberty and property" (*id.* at 569, 92 S.Ct. at 2705). Lucas' claim, then, necessarily depends on his ability to show deprivation of a liberty or property interest.

Lucas and La Grange disagree vehemently about Lucas' possession of a liberty or property interest. Lucas claims that he met all of the requirements for the old building ordinance and that under the applicable laws and mutual understandings his applications should have been granted. He urges that he was deprived of both liberty and property interests. For its part La Grange argues that no liberty interest is implicated by Lucas' claim and that Lucas could not have had a protected property interest in continuance of an ordinance because he was on notice that a zoning change was imminent. This opinion turns to resolution of those disputes.

■ As for the liberty-interest issue, Lucas contends that La Grange deprived him of such an interest in his upholstery occupation. It has long been recognized that liberty, as protected by the Due Process Clause, does include occupational liberty (see, e.g., *Wroblewski v. City of Washburn,* 965 F.2d 452, 455 (7th Cir.1992)). But properly understood that means "the liberty to pursue a *calling or occupation,* and not the right to a specific job" (*id.;* see also *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1343–44 (7th Cir.1987)).[6]

■ There is no need here to decide the limits of that concept—for example, whether Lucas could or could not be forced to transplant himself (say by moving to a different city) in order to pursue his chosen occupation. It suffices for present purposes to say that Lucas certainly has no constitutionally protected liberty interest in running an upholstery shop at a specific new location in La Grange as long as he was free to continue to work as an upholsterer right next door.[7]

Lucas has not raised a genuine issue of material fact on that issue, and his claim of a deprivation of occupational liberty therefore fails.

As his second line of attack, Lucas presses a claim of deprivation of a property interest. Analysis of that claim is a good deal more complex, requiring more extended discussion.

■ Property interests do not derive from the Constitution but from "an independent source such as state law" (*Roth,* 408 U.S. at 577, 92 S.Ct. at 709). There need not be an express statutory provision evidencing the entitlement, for it may arise from an implied promise on the part of the State (see *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) ("a person's interest in a benefit is a 'property interest' for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit") and, applying *Perry, Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 224 n. 9, 106 S.Ct. 507, 513 n. 9, 88 L.Ed.2d 523 (1985); accord, *Shlay v. Montgomery,* 802 F.2d 918, 922 (7th Cir.1986)). But in any event Lucas must show that he had more than "an abstract need, desire or unilateral expectation, [ ] rather ... an entitlement" (*Munson v. Friske,* 754 F.2d 683, 692 (7th Cir.1985)).

In support of his argument that he had a vested right to his business license, Lucas argues (1) that the La Grange ordinances in effect from November 15, 1990 through January 28, 1991 were directory and not discretionary in nature, (2) that municipal ordinances provide for the relocation of a licensed business and (3) that he relied to his detriment and incurred substantial expenses in reliance on the probability that his applications would be approved. As to that type of claim, the standard is stated succinctly in

---

6. That distinction is a variant of the teaching (in a different context) of *Paul v. Davis,* 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976) and its progeny that loss of a job does not amount to a liberty deprivation so long as alternate employment remains available.

7. It will be remembered that in late 1990 Lucas had more than eight years remaining on his lease

of the 5 La Grange Road premises where he was already conducting his upholstery business. That would ordinarily represent a prior nonconforming use (and almost certainly a property interest) that would be left untouched by the new ordinance, and nothing in the record suggests otherwise.

*Polenz v. Parrott,* 883 F.2d 551, 556 (7th Cir.1989):

> [W]here a municipal ordinance provides substantive criteria which, if met, dictate the issuance of a permit, an applicant who has met those criteria might assert a legitimate claim of entitlement to the permit.

Lucas separates his arguments as to the business license and occupancy certificate.[8] As to the former he points to two La Grange Ordinances. Section 110–1 governs the granting of licenses and permits:

> Except where otherwise provided, all licenses, permits and registrations authorized or required by this Code shall be granted by the president and the board of trustees, who shall have power to hear and grant applications therefor.

Section 110–60 deals with changes of location:

> The location of any licensed or registered business or occupation, or of any permitted act, may be changed, provided ten (10) days' notice thereof is given to the department of economic development, and permission granted by the president and board of trustees, in the absence of any provision to the contrary; provided that the building and zoning requirements of this Code and the ordinances of the village are complied with.

As for applications for a Certificate of Occupancy, La Grange Zoning Ordinance § 8.2(c), in effect from November 15, 1990 through January 28, 1991, provided:

> No Certificate of Occupancy for a structure, or addition thereto, constructed, reconstructed, remodeled or moved after the effective date of this Ordinance shall be issued until such work has been completed and the premises inspected and certified by the Enforcement Officer to be in full and complete compliance with all the applicable regulations of this Ordinance.
>
> Provided, however, that a Certificate of Occupancy shall be issued or a written notice shall be given to the applicant stating the reasons why a Certificate cannot be issued, within 15 days after the receipt by the Enforcement Officer of written notification that the structure or premises is ready for occupancy.

Though Lucas concedes that his applications indicated that he intended nonpermitted uses, he argues that any deficiencies in his applications could have and would have been corrected if the usual practice of assisting applicants had been followed (his Mem. 14). As a result he claims an entitlement.

▪ Illinois law is clear that there is ordinarily no vested right in the continuance of a zoning law or ordinance (*O'Connell Home Builders, Inc. v. City of Chicago,* 99 Ill. App.3d 1054, 1060, 55 Ill.Dec. 166, 170, 425 N.E.2d 1339, 1343 (1st Dist.1981)). But an established exception to that general rule is equally clear—here is the statement from *Pioneer Trust & Sav. Bank v. County of Cook,* 71 Ill.2d 510, 522, 17 Ill.Dec. 831, 836, 377 N.E.2d 21, 26 (1978) (quoting an earlier case) that has also been followed regularly by Illinois Appellate Court cases since then:

> [W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classifications.

▪ That exception is in turn qualified to a meaningful extent: Any applicant who knew or should have known of a pending zoning amendment cannot have a vested right in the then existing law, because the applicant could not have relied justifiably in good faith that the prior law would be applied to him or her (see *Westerheide v. Obernueferman,* 3 Ill.App.3d 996, 279 N.E.2d 402 (5th Dist.1972) (per curiam))—a proposition that, although not always stated in precisely those terms, remains good law today (see *Tim Thompson, Inc. v. Village of Hinsdale,* 247 Ill.App.3d 863, 875–76, 880–81, 187 Ill. Dec. 506, 617 N.E.2d 1227 (2d Dist.1993)). *Chicago Title & Trust Co. v. Village of Pala-*

---

**8.** In this respect Lucas makes no argument as to a property interest in a sign permit.

*tine,* 22 Ill.App.2d 264, 270, 160 N.E.2d 697, 700 (1st Dist.1959) explains:

> It would be utterly illogical to hold that, after a zoning commission had prepared a comprehensive zoning ordinance or an amendment thereto, which was on file and open to public inspection and upon which public hearings had been held, and while the ordinance was under consideration, any person could by merely filing an application compel the municipality to issue a permit which would allow him to establish a use which he either knew or could have known would be forbidden by the proposed ordinance, and by doing so nullify the entire work of the municipality in endeavoring to carry out the purpose for which the zoning law was enacted.

Lucas and La Grange present a mixed (and only partially filled) bag in those terms. On the one hand, long before Lucas entered into the lease for 1 South La Grange Road, La Grange had sent notices of the proposed ordinance to all residents in La Grange and had held a public hearing on the proposed revision. On the other hand, Lucas disclaims having received such notice (a disclaimer that must be credited on the present record). And even if he had, the extraordinarily prolonged lapse of time between the hearing date and the date on which Lucas took his action to obtain a new lease would appear to bear on the justifiability of his reliance on the existing (and unchanged) ordinance.[9]

To add to the open issues, the record does reflect that on the same day that he entered into his lease Lucas wrote Randall that he had been told that the proposed ordinance would not allow upholstery shops—so that he had certainly been apprised that the new ordinance was in the works at some point before he signed on the dotted line. But this Court has been left in the dark as to what expenditures and commitments Lucas may have made before he was told that. After

all, commercial leases do not spring into being overnight.[10]

In sum, this Court has not been afforded a factual submission sufficient to resolve the issue. Even worse, the factual gaps in the record force the drawing of inferences in opposite directions on the cross-motions. Thus neither side could prevail on the questions already referred to or on such issues (for example) as whether La Grange encouraged reliance by Lucas (see *Pioneer Trust & Sav. Bank,* 71 Ill.2d at 522–24, 17 Ill.Dec. at 836–37, 377 N.E.2d at 26–27), or whether La Grange's actions in passing the amendments or in delaying or refusing to issue his permits were unreasonable, arbitrary or in bad faith (see, e.g., *Westerheide,* 3 Ill.App.3d at 999, 279 N.E.2d at 404; *Chicago Title & Trust,* 22 Ill.App.2d at 269, 160 N.E.2d at 700; *Phillips Petroleum Co. v. City of Park Ridge,* 16 Ill.App.2d 555, 564–67, 149 N.E.2d 344, 349–50 (1st Dist.1958)); see generally R. Chase, *Annotation, Retroactive Effect of Zoning Regulation, in Absence of Saving Clause, on Pending Application for Building Permit,* 50 A.L.R.3d 596, 664–67.

In an odd way it may be fortunate that the issues are not capable of resolution here (though it has certainly been a source of substantial annoyance that this Court and its law clerk have been put to a great deal of time and effort in trying to make some order out of the chaos tendered by the parties). As it turns out, the matter is not appropriate for decision by this Court anyway—for another reason that the parties have not dealt with but that causes Lucas' procedural due process claim to fail in a different way.

■ If Lucas did have a vested right rather than a unilateral expectation under state law (as already explained, a necessary element in a deprivation-of-property claim), he could have forced issuance of the requested permits via a mandamus action (see, among a number of Illinois cases so holding, *Pioneer*

---

**9.** In that respect see, e.g., *Naumovich v. Howarth,* 92 Ill.App.2d 134, 138–40, 234 N.E.2d 185, 187–88 (4th Dist.1968).

**10.** P. 12(m) ¶ 10 asserts, based on P. Exs. 7 and 8, that he had begun to negotiate for the new lease by August 1990. Though D. 12(n) ¶ 10 does not admit that, La Grange offers nothing to re-

fute it. That in turn means that Lucas' version must be accepted as accurate (see n. 4) but in any event this Court was not given all of the evidence needed for final resolution. In this instance, though, it turns out not to make a difference—but only on the technical ground discussed hereafter in this section.

*Trust & Sav. Bank,* 71 Ill.2d at 522–24, 17 Ill.Dec. at 836–37, 377 N.E.2d at 26–27 and *O'Connell Home Builders,* 99 Ill.App.3d at 1059–61, 55 Ill.Dec. at 170, 425 N.E.2d at 1343). To the identical effect, *New Burnham Prairie Homes,* 910 F.2d at 1480 dealt with a claim of entitlement to a local building permit and an alleged scheme to deprive plaintiff of that permit—and the court rejected plaintiff's procedural due process claim on the ground that an adequate postdeprivation remedy existed in the form of a mandamus action.[11] *Lucas,* like the *New Burnham Prairie Homes* plaintiff, never availed himself of that remedy, and his procedural due process claim therefore fails.[12]

### Substantive Due Process

Lucas also contends that La Grange's arbitrary and irrational actions in delaying and denying his applications violated his substantive due process rights. In this same context of zoning disputes our Court of Appeals has acknowledged the tension between two potentially competing considerations. (see *New Burnham Prairie Homes,* 910 F.2d at 1480–81). One such consideration recognizes that substantive due process claims can be brought in the context of property interests (see, e.g., *Estate of Himelstein v. City of Fort Wayne,* 898 F.2d 573, 577 (7th Cir. 1990)).[13] But at the same time our Court of Appeals has said that it "is not a zoning board of appeals" (*Himelstein,* 898 F.2d at 578).[14] To reconcile those considerations *New Burnham Prairie. Homes,* 910 F.2d at 1481 (citations omitted) defines the requirements for such claims with some strictness:

[I]n addition to alleging that the decision was arbitrary and irrational, "the plaintiff must also show either a separate constitutional violation or the inadequacy of state law remedies." "[I]n cases where the plaintiff complains that he has been unreasonably deprived of a state created property interest, without alleging a violation of some other substantive constitutional right or that the available state remedies are inadequate, the plaintiff has not stated a substantive due process claim."

Apart from Lucas' First Amendment claim (dealt with in the next section of this opinion), he has identified no separate constitutional violation. As for the issue of state law remedies, the same availability of an action in mandamus that defeated Lucas' procedural due process claim impacts with equal force on his substantive due process claim. It too fails (subject to the same considerations that have been identified in n. 12).

11. *New Burnham Prairie Homes'* holding, which rested on the court's view of defendants' activities as "random and unauthorized" (*id.* at 1480), stemmed from decisions in *Parratt v. Taylor* and *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) that a procedural due process claim does not lie where defendants' conduct was "random and unauthorized" and where state law provides an adequate postdeprivation remedy. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) did limit the reach of *Parratt* and its progeny by holding them inapplicable in circumstances where the violative action was predictable, so that predeprivation procedural safeguards could prevent future deprivations. In that respect Lucas does argue that denial of his permits was neither random nor unauthorized, seeking to support that position by pointing to the high ranking positions held by the individual defendants and to the allegedly tainted interest of La Grange's attorney. But *Easter House v. Felder,* 910 F.2d 1387, 1400 (7th Cir.1990) (en banc) and *New Burnham Prairie Homes* (a case similar in nature to this one and decided in the wake of both *Zinermon* and *Easter House* ) both indicate that any unconstitutional conduct that may have occurred here was not "predictable and authorized" in the sense that *Zinermon* framed the inquiry: There is simply no way that Lucas could show that the timing of a deprivation could have been anticipated or that pre-mandamus process would have prevented it. For a more detailed discussion of this issue, see this Court's opinion in *Jones v. Doria,* 767 F.Supp. 1432, 1439–41 (N.D.Ill.1991).

12. This ruling obviously does not (1) implicate the merits of Lucas' claim or (2) preclude Lucas' access to a state court mandamus. action.

13. Some cases following that approach have held that an unreasonable interference with issuance of a permit, if motivated by impermissible reasons, can support a substantive due process claim (see, e.g., *Bello v. Walker,* 840 F.2d 1124, 1129–30 (3d Cir.1988)).

14. Justice Marshall, dissenting in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797 (1974), made the same observation:

Our role is not and should not be to sit as a zoning board of appeals.

### First Amendment

 Apart from the generalized substantive due process claim that has just been dealt with, Lucas invokes the Due Process Clause in a more specific substantive sense: He claims that La Grange violated his First Amendment commercial speech rights. Although he has not included a copy of the ordinance with his summary judgment papers, Lucas contends that La Grange's application of that ordinance violated his First Amendment rights (1) by refusing to allow him to post his telephone number or the word "upholstery" on business signs and (2) by failing to issue him the permits that he requested under the ordinance.

Defendants seek to avoid those issues by pointing out that Lucas was charged with a zoning violation in state court and that the charges against him were dismissed. Their Mem. 13 argues that "[a]ny violation notice sent by the Village of La Grange would be in violation of the Circuit Court of Cook County's order"[15] and that all related issues are therefore moot. But the state court transcript provided to this Court expressly reflects that the state court judge did *not* rule on the constitutionality of the La Grange sign ordinance. And as for the mootness argument, defendants have ignored some relevant (or potentially relevant) factors.

For one thing, Lucas asserts that his exercise of First Amendment rights was chilled before the state court hearing. That seems doubtful given the fact that he actually exhibited his sign *without* seeking or obtaining a permit (hence the institution of the violation complaint), but the record before this Court does not provide the full information needed to resolve that contention. Lucas also points out that La Grange has not yet issued him a sign permit, but that fact appears irrelevant in light of La Grange's acknowledgment here (which would be binding on it everywhere as a legal matter) that it cannot enforce the sign

ordinance against him. But perhaps most importantly, Lucas plainly has a colorable argument for his having sustained damages (for example, legal fees incurred in the successful defense of the state charges) by reason of the claimed First Amendment violation.[16]

In sum, La Grange has plainly failed in its attempt to show that Lucas' claim is moot. On then (if only briefly) to the First Amendment issue.

Though neither Lucas nor La Grange has briefed this Court on commercial speech, Lucas directed the state court in the quasi-criminal proceeding to a portion of Section 11–107 of La Grange's Zoning Ordinance:[17]

> The following signs, as well as all other signs not expressly permitted by this Article XI, are prohibited in all districts and shall not be erected, maintained, or permitted to continue in any district, except as provided in Section 12–106 of this Code:
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> S. Any sign displaying the price of any goods or services or any interest rate or any telephone number, except that telephone numbers may be permitted on real estate signs and the prices of gasoline may be permitted on signs maintained for gasoline service stations.

Where commercial speech is at issue, *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) plays a guiding role in the inquiry:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within the provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must

---

**15.** Defendants did not provide this Court with a copy of that order either.

**16.** It seems most likely that all of those shortcomings flow from defendants' failure to file a timely response to Lucas' cross-motion. But for whatever reason, here (as throughout the handling of the current motions) this Court has not been armed with enough input to permit an informed resolution of the issues.

**17.** This Court has been provided with at least some of the briefs filed in state court on the commercial speech issue.

determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

There is no question that Lucas' speech was protected, for it concerns lawful activity that is not misleading. On the other side of the coin, it is fair to assume that La Grange's governmental interest in traffic safety and aesthetics is substantial (see the plurality opinion in *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 507–08, 101 S.Ct. 2882, 2892–93, 69 L.Ed.2d 800 (1981)).[18] What remains for resolution then is whether the regulation directly advances those interests and whether there is a "reasonable fit" between La Grange's ends and the means chosen to accomplish them (see *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, —— & n. 12, 113 S.Ct. 1505, 1510 & n. 12, 123 L.Ed.2d 99 (1993)). Those questions are certainly not ripe for resolution on the scanty record provided on the current cross-motions. Both motions are denied, and the issues will await fleshing out at trial.

### Equal Protection

■ Finally, Lucas alleges a violation of the Equal Protection Clause in two respects. First, his Mem. 21 complains that La Grange "has singled out plaintiff, failing and refusing to act on or assist him with his various license applications." But that portion of his claim is doomed both by recent opinions of our Court of Appeals and by the absence of an essential ingredient of any equal protection claim.

Lucas relies heavily on *Falls v. Town of Dyer*, 875 F.2d 146 (7th Cir.1989) in support of his argument that by singling him out for adverse treatment La Grange violated his entitlement to equal protection. If this Court were writing on a clean slate—or more accurately, if the sole source of law were the language of the Equal Protection Clause and what the Supreme Court has said about it—it might find that position had substantial force (see, e.g., this Court's opinion is *Ossler v. Village of Norridge*, 557 F.Supp. 219, 223–24 & n. 6 (N.D.Ill.1983) and *Jones v. Lane*, 568 F.Supp. 1113, 1116 (N.D.Ill.1983), citing *Snowden v. Hughes*, 321 U.S. 1, 7, 8, 10, 64 S.Ct. 397, 400, 401, 402, 88 L.Ed. 497 (1944) and Judge Learned Hand's opinion in *Burt v. City of New York*, 156 F.2d 791, 791–92 (2d Cir.1946)).[19]

But our Court of Appeals backed away from *Falls* shortly after it was written, when *New Burnham Prairie Homes*, 910 F.2d at 1481 stated this proposition for equal protection claims:

> Discrimination based merely on *individual*, rather than group, reasons will not suffice.

And most recently *Albright v. Oliver*, 975 F.2d 343, 348 (7th Cir.1992) has disavowed the "singling out" approach entirely:[20]

> [Plaintiff] does not claim to have been singled out for prosecution because he was black or a member of some other minority, but he points out that a class with only one member can still complain of discrimination against his tiny class. *United States v. Falk*, 479 F.2d 616, 619 (7th Cir.1973) (en banc); *Falls v. Town of Dyer*, 875 F.2d 146 (7th Cir.1989).... To close the question left open in *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992), we hold that "the state's act of singling out an individual for differential treatment" does *not* "itself create the class." That would make every selective

---

**18.** La Grange's interests are set forth in La Grange Zoning Ordinance § 11–101:

The regulation of signs by this code is intended to promote and protect public health, safety and welfare ... by creating a more attractive economic and business climate within the office and commercial areas of the Village; ... and by reducing the distractions, obstructions, and hazards to pedestrians and auto traffic caused by the indiscriminate placement and use of signs.

**19.** No one these days seems to pay attention to the clear language in *Snowden* or, for that matter, to the fact that the Fourteenth Amendment's prohibition is phrased "nor shall any State ... deny to *any person* within its jurisdiction the equal protection of the laws."

**20.** Although certiorari has been granted in *Albright*, —— U.S. ——, 113 S.Ct. 1382, 122 L.Ed.2d 757 (1993), the issue presented for review does not appear to include that subject.

■■■■■■■■■■■

prosecution, and indeed every arbitrary act of government, a violation of the Constitution.

■■■ Hence Lucas must lose on that facet of his claim under current Seventh Circuit law. But he has a problem even apart from that. *Wroblewski*, 965 F.2d at 459 states the truism that controls all such claims:

> The equal protection clause's proscription of differential treatment applies only where individuals are similarly situated.

Lucas has offered no admissible evidence that anyone else whose application would have been affected by the amended zoning ordinance was allowed to slip in under the gun.[21]

But Lucas has another string to his Equal Protection Clause bow: He contends (R. Mem. 3–4, 7) that the New Comprehensive Zoning Ordinance discriminated against upholstery shops (certainly a classification to which Lucas belongs) in comparison with all other service businesses. According to the evidence that he has submitted, upholstery shops were the *only* one of the many types of shops providing a broad range of miscellaneous repairs that had been permitted in commercial zoning districts under the prior ordinance but were then barred from the C–1 district by the new ordinance (though such a use is permitted in the C–2 through C–4 districts).

Because of La Grange's delinquency in complying with the ground rules that this Court had set for submissions on the current motions (see n. 3), that contention has not

been answered in either factual or legal terms. It does not appear to confront the same "singling out" problem as Lucas' other equal protection claim, and by definition no justification has been suggested by defendants for the differential treatment of the class of upholstery shops. Hence defendants' motion to reject Lucas' equal protection claim must be denied in that respect.

*Conclusion*

Albeit for varying (and in several instances nonsubstantive) reasons, defendants are entitled to a judgment as a matter of law on Lucas' claims that they violated his rights to procedural or substantive due process (excepting, in the latter respect, Lucas' First Amendment claim). In all other respects both parties' current motions are denied. As to those surviving issues, a status hearing is set for 8:45 a.m. September 8, 1993 to determine the future course of this action.[22]

---

21. Lucas did say in Amended Complaint ¶¶ 28–29 that La Grange had issued a business license to Chicagoland Complete Services, Inc. ("Chicagoland") for a location on the same block as Lucas' business and that Chicagoland had "performed on its premises, among other services, the reupholstery of fire damaged furniture." La Grange's Amended Answer ¶¶ 28–29 admitted issuing the business license but said (1) that Chicagoland had submitted a complying business license application and (2) that it had insufficient knowledge or information about Chicagoland's having performed reupholstery work at its premises. Lucas has not mentioned that issue in his summary judgment submissions, and under Rule 56(e) the nonadmitted statement in the Amended Complaint may be ignored for summary judgment purposes. In any event the issue would not be outcome-determinative in light of *Albright.*

22. This opinion has been studded with references to the distressingly inadequate submissions by the litigants—principally but not exclusively by defendants. It should not close without acknowledging that it could not have been prepared without the unflagging eagerness (in this case as in all others) of this Court's law clerk Adam Hoeflich, Esq. to go well beyond what the parties had tendered, on both the analysis of issues and the case law, in the course of preparing a draft for this Court's review and revision. Just one example is the reliance (by both parties!) on *Falls v. Town of Dyer* when further research disclosed the recent disavowal of that opinion by our Court of Appeals (see the *Equal Protection* section of this opinion). Having said all that, this Court is quick to add that if any errors may be found in this opinion, they are the sole responsibility of this Court and not of its able law clerk.