PREMIER ELECTRICAL CONSTRUCTION COMPANY, Plaintiff-Appellant, v. MORSE/DIESEL, INC., *et al.*, Defendants-Appellees.

First District (6th Division)   Nos. 1—92—2104, 1—92—3653 cons.

Opinion filed December 30, 1993.

446

Michael W. Rathsack, of Chicago (Mark E. Levine, of counsel), for appellant.

Harvitt & Gekas, Ltd., of Chicago (Constantine John Gekas, of counsel), and Peter M. D'Ambrosio and Krista L. Peterson, both of Smith, Pachter, McWhorter & D'Ambrosio, of Vienna, Virginia, for appellees.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

On May 15, 1987, plaintiff Premier Electrical Construction Company (Premier) filed a verified complaint wherein it alleged fraudulent misrepresentation and breach of contract and sought punitive damages. Specifically, the complaint alleged that in January 1981, Premier entered into negotiations with defendant Morse/Diesel, Inc., and defendant Francis X. O'Boyle, Morse's vice-president (collectively referred to as Morse), to secure the bid for electrical work on the Furniture Mart building renovation project at 666 North Lake Shore Drive. During those negotiations, Morse represented to Premier's agents, Michael Hughes, Premier's vice-president, and Douglas Boyko, Premier's project manager/estimator, that Morse had received two lower competing bids for the electrical work. Morse then gave Premier the option of reducing its bid by $500,000 or forfeiting the subcontract entirely.

Relying on Morse's allegedly fraudulent oral representations, Premier reduced its bid from $4.8 million to $4.3 million and was awarded the contract. Premier later learned, however, in October 1983, from James Driscoll, Charles Gustafson and William Wachter that the purported competitive bids were false, and that they had been misrepresented to Premier by Morse in an effort to persuade Premier to reduce its bid for the electrical work.

Morse filed an unverified answer, while another defendant, David Paul, filed a motion claiming that he was a nonresident and, therefore, a beneficiary of the fiduciary shield doctrine. Service of process as to Paul was then quashed.

Morse subsequently filed a motion for summary judgment which set forth the background of the project. David Paul, owner and general partner of 666 North Lake Shore Drive Associates, engaged in the renovation of the Furniture Mart, renamed 666 North Lake Shore Drive, between the years 1979 and 1984. Initially, Paul solicited the services of W.E. O'Neil Construction Company (O'Neil) as general contractor for the project. Although no contract was ever signed between O'Neil and 666 North Lake Shore Drive Associates, O'Neil acted in the capacity of general contractor until November 1980. During the time period that O'Neil served as general contractor, Premier submitted a bid to O'Neil in the amount of approximately $2.4 million to perform the electrical subcontract on the project. Although Premier acquired construction materials under a letter of intent, it never entered into a subcontract with O'Neil.

In November 1980, final contract negotiations between O'Neil and Paul were unsuccessful. Thereafter, on December 24, 1980, Paul entered into a general construction contract for the project with Morse. Premier then submitted a revised bid of $4.8 million to 666

North Lake Shore Drive Associates and Morse for the electrical subcontract. Paul, O'Boyle, Hughes and Boyko met on several occasions in late December 1980 and early January 1981 to negotiate the electrical subcontract. According to the deposition testimony of Hughes, Premier was reviewing the scope of the proposed work so that Morse would understand what was included in the bid price; Premier was not actually negotiating its price at that time.

During one such meeting which was held on January 7, 1981, Paul and O'Boyle informed Hughes and Boyko that they had received two oral bids, each in the amount of $4.3 million, from other electrical contractors to perform the electrical work. Morse admits that it made this representation to Premier. When Hughes asked to see these bids, the meeting was adjourned for several hours so that the details of the bids could be provided to Premier. Boyko confirmed this fact. A representative of Morse contacted Lawrence Dolan, executive vice-president of Commercial Light, Inc. (Commercial Light), who then provided a copy of Commercial Light's oral bid of $4.3 million. Hughes testified at his deposition that "the scope of the work had been pretty well thrashed out" either at or prior to that January 7 meeting and that Morse was asking Premier to reduce its markup, fee or some other items that it had included in its proposal. Hughes could not recall whether Premier had been allowed to ask for certain exclusions or qualifications to the scope of the work in order to arrive at the lower figure.

When the meeting reconvened later that day, Morse gave Hughes and Boyko a copy of Commercial Light's bid, while Paul orally relayed to them the details of the bid from Sievert Electric Corporation (Sievert). Boyko's contemporaneous notes of that meeting confirmed that he and Hughes received a written Commercial Light bid as well as oral details of the Sievert bid at the meeting. According to the deposition testimony of O'Boyle, the Commercial Light and the Sievert bids were based on an 18-month rather than a 24-month project. O'Boyle further testified that he first saw a written bid from Commercial Light when it was sent over by messenger during the course of the meeting with Premier. Boyko testified at his deposition that he did not recall a discussion regarding a comparison being made between the Sievert and the Premier bids at the January 7 meeting. Although Boyko remembered that there was a bid from Sievert for the project, he could not recall whether it was oral or written. He did not remember seeing a bid from Commercial Light. Boyko further testified that at some point, he and Hughes presumably agreed that $4.3 million was a reasonable price for which to perform the work.

In addition to these bids being discussed, negotiations regarding revisions to Premier's planned 24-month construction schedule and scope of work ensued. During these negotiations, which continued for more than a week following the January 7, 1981, meeting, Premier proposed various revisions to the subcontract as well as a shortened construction schedule which allowed it to reduce its bid to $4.3 million.

At no time during the January 7, 1981, meeting or at any subsequent meeting did Premier challenge the authenticity, accuracy or scope of the Commercial Light and Sievert bids. Moreover, Premier did not attempt to contact Commercial Light and Sievert regarding their bids.

Boyko testified at his deposition hearing that he sent a letter dated January 9, 1981, to O'Boyle confirming the terms and conditions under which Premier would perform the work for $4.3 million. Subsequently, on or about February 19, 1981, Morse and Premier signed a subcontract for the electrical work in the amount of $4.3 million. Premier's lower bid reflected a construction schedule which had been shortened from 24 to 18 months as well as revisions to the subcontract including, for example, not requiring that the low voltage be encased in conduit. Premier substantially completed its contract in 1984.

Dolan stated in his affidavit that Morse contacted him in or around December 1980, requesting that Commercial Light submit a bid for the subject project. Shortly thereafter, Commercial Light furnished an oral bid to Morse in the approximate amount of $4.3 million. Dolan further stated that in January 1981, Morse requested that he confirm his oral bid in writing. Dolan then sent a written bid to Commercial Light in the approximate amount of $4.3 million. Commercial Light's copy of that purported written bid, however, was allegedly discarded by Commercial Light when the company moved its offices in November 1988.

During the discovery process, the parties took the depositions of O'Boyle, Dolan, Thomas Halprin, Hughes, James Driscoll, Boyko and William Templeman, Sr., in Chicago and Charles Gustafson and William Wachter in Fort Lauderdale, Florida.

On October 3, 1991, after discovery had been completed, Morse filed a motion for summary judgment relying on, *inter alia*, the above deposition testimony. Morse also submitted Dolan's affidavit, which stated that in January 1981, Commercial Light submitted a genuine bid for the electrical subcontract in the amount of $4.3 million.

On October 10, 1991, the trial court ordered Premier to file its response to Morse's motion by November 8, 1991, and set a status

conference for November 27, 1991. On November 8, 1991, however, Premier filed a motion for additional time to respond to Morse's motion for summary judgment, wherein it requested that it be given until November 29, 1991, to respond since the deposition of Dolan, one of the affiants supporting Morse's motion, had not yet been transcribed. The trial court granted Premier's motion, allowing Premier until December 2, 1991, to respond. It also rescheduled the status conference for January 22, 1992.

On December 2, 1991, however, Premier did not file its response. Thereafter, on December 10, 1991, counsel for Morse wrote to Premier's counsel informing him that he had not received a response. Premier's counsel, Marc Levine, then contacted Morse's local counsel, Chris Gekas, and requested additional time to file its response. In a letter dated December 13, 1991, Morse agreed not to object to Premier's late filing as long as Morse received Premier's response two weeks before the January 22, 1992, status conference.

Premier, however, never filed a response. At the January 22, 1992, status conference, Premier, without motion or prior notice to Morse or the court, orally requested a second extension of time from the court. Premier asked for an additional 14 days within which to file its response to Morse's motion. Levine informed the court that he had been out for 10 days due to an illness, and that his partner had suffered a stroke. He further informed the court that he had been under the impression that his associate had completed the response, but later discovered, on the day prior to the status conference, that that was incorrect. Defense counsel objected, and the trial court denied Premier's oral motion, but stated that Premier could present its oral argument at the summary judgment hearing which it then scheduled for April 30, 1992. Premier did not file a motion for reconsideration of the court's order.

On April 24, 1991, approximately one week prior to the hearing, Premier filed an emergency motion for leave to file response to motion for summary judgment instanter. Levine attached an affidavit to his motion, stating that his law partner had suffered a heart attack in November 1991 followed by a stroke caused by a malignant brain tumor in January 1992. Because his partner had not practiced since that latter date, Levine had been trying to perform the work of two attorneys.

At the hearing on Premier's emergency motion on April 24, 1992, Premier offered, for the first time, the affidavit of Carl Sievert, who, Premier claimed, was "previously unavailable," although it did not explain why Sievert, a resident of Chicago, had been "unavailable" for four years. The affidavit was attached to Levine's emergency mo-

tion. The trial judge, however, denied the motion, stating "I don't know why we have to revisit these things so many times." On April 29, 1992, Premier filed, without leave of court, its response to Morse's motion for summary judgment along with excerpts from the depositions of O'Boyle, Dolan, Driscoll and Gustafson and the Sievert affidavit. In his affidavit, Sievert states that Sievert Electric never submitted a bid for the Furniture Mart job at issue, contradicting Morse's claim to Premier in 1981 that a lower bid had been secured from Sievert Electric.

Premier's tendered response to Morse's motion for summary judgment is in agreement with Morse's except for the following distinctions. Morse met with Premier in late December 1980 or early January 1981. At that time, O'Boyle represented to Premier that he had information from Sievert Electric and Commercial Light and claimed that Sievert had provided an oral bid based on Sievert's review of the project documents within a day or two of Morse's meeting with Premier. O'Boyle stated that he never saw anything in writing from Sievert and that Commercial Lighting initially bid verbally. According to the deposition testimony of O'Boyle, it was usual and customary, based on his experience with Morse, that if in fact Morse solicited a bid from a contractor, there would be some kind of documentation. Morse subsequently informed Commercial Light that it had selected Premier, but did not notify Sievert of the same, because ownership, not Morse, had solicited that bid.

When asked at his deposition hearing whether he had any independent recollection of a bid being made prior to being told by Peter Herzog, in-house counsel for Morse, that he had submitted a bid for Commercial Light in December 1980, Dolan testified that he remembered, but was uncertain as to the date the bid was made. He further testified that he remembered that the bid for the project was over $4.0 million, prior to being told by Herzog that the exact amount was $4.3 million. He stated that he obtained the drawings from Morse, but did not remember which side contacted the other with regard to submitting an estimate for the project. The estimate took about three or four weeks to prepare. Dolan stated that O'Boyle called him a couple weeks after the oral bid was submitted and asked him to confirm the bid in writing.

In his affidavit dated April 21, 1992, Carl Sievert, vice-president of Sievert Electric, stated that he was "specifically familiar" with the Furniture Mart project because Sievert Electric had performed some minor work there after the start of the major remodeling by Morse. He further testified, however, that at no time during November or December 1980 or January 1981 did Sievert Electric submit a bid or

prepare a bid estimate on the main electrical remodeling work. Sievert Electric did not provide an oral or written proposal or bid estimate to W.E. O'Neil, Morse, O'Boyle or anyone associated with the ownership of that project during that time period.

James Driscoll testified at his deposition hearing that he specifically remembers having a meeting with O'Boyle because Driscoll had $800,000 of his own funds at risk. At that meeting, O'Boyle discussed with Driscoll in detail the bidding process with Premier on the project. O'Boyle told Driscoll that O'Boyle had "screwed [Premier] out of a half million dollars or something by telling them he had a better price and proving it with a false bid." O'Boyle told Driscoll that at the meeting with Premier, O'Boyle ran upstairs, called one or two individuals and told them to bring a bid over. O'Boyle then said he had to take the developer into another room and tell him to stop recalculating the numbers because the bid was phony. O'Boyle's admission was allegedly confirmed by the deposition testimony of Charles Gustafson, another contractor who was at the meeting with O'Boyle, Driscoll and others. Gustafson testified that he thought one of the letters containing a phony bid, which was obtained by O'Boyle, was from Commercial Light, but was not sure whether the letter was actually from that company.

Finally, although the project was scheduled for completion in August 1982, it was not completed until February or March 1983.

At the hearing on Morse's motion for summary judgment, Premier asked for leave to file the Sievert affidavit pursuant to section 2—1005(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c)), which allows affidavits to be filed prior to or at the hearing on a motion for summary judgment. Defense counsel responded that the affidavit was immaterial. The trial court denied Premier's request and, after argument, granted summary judgment in favor of defendants and against Premier.

Premier filed its notice of appeal on May 29, 1992. On the same date, Morse filed a motion to tax costs. Premier did not withdraw its appeal.

On September 21, 1992, the trial court, without hearing argument, struck Morse's motion to tax costs, finding that it did not have jurisdiction to hear the motion "due to [p]laintiff's filing its notice of appeal" in this case. On October 21, 1992, Morse appealed from this final judgment. Premier did not refile its notice of appeal after this final judgment. On December 9, 1992, these appeals were consolidated by order of this court.

On appeal, Premier contends that: (1) the trial court abused its discretion when it denied Premier's request for a 14-day extension

within which to file its response to defendants' summary judgment motion as well as subsequent requests to file the response; and (2) the trial court erred when it granted summary judgment in favor of defendants. For the following reasons, we affirm.

Initially, we note that because we affirm the trial court's decision granting summary judgment in favor of defendants, we need not consider the jurisdictional issue raised by them in this matter.

Premier first contends that the trial court abused its discretion at the status conference on January 22, 1992, when it denied its request for an additional 14 days within which to file its response to Morse's motion for summary judgment. Premier asserts that there is nothing in the record to suggest a reason for the denial where depositions had been taken, records produced and discovery answered. Furthermore, Premier argues that the status hearing was the appropriate time for it to make its request for additional time since that is one of the reasons for setting a matter for status. Premier claims that this is especially true here in light of the fact that Morse's motion had not yet been set for hearing at the time Premier made its request. Rather, the hearing date was not scheduled at the status conference until after Premier made its request. Because Morse's motion would not be heard until April 30, 1992, more than two months after Premier asked for a two week extension, Premier asserts that such a time extension, had it been granted, would not have delayed the hearing date or caused prejudice to the court or any party.

Premier also argues that the basis for its request was reasonable under the special circumstances which existed at its counsel's law firm, namely the debilitating illness of one of the firm's two partners, which left the remaining partner, Premier's counsel Levine, to perform the work of two lawyers in an effort to preserve the practice. Premier maintains that under such unique circumstances, there should not have been an objection to its request since professional courtesy and civility should have dictated the response. It argues that the trial court should have overruled the objection and allowed the extension, where defense counsel did not allege or demonstrate any prejudice.

Premier claims that it was highly prejudiced by the court's ruling on its oral request at the status conference as well as its subsequent requests, because its proposed response would have allegedly defeated Morse's motion for summary judgment. Premier asserts that its response would have destroyed Morse's argument as it established that neither of the two bids Morse represented to Premier as being lower, which it was expected to match in order to retain the job, ever existed.

Contrarily, Morse asserts that the trial court did not abuse its discretion in denying Premier a fourth extension of time to file its response brief, arguing that Premier did not explain the circumstances and litigation history surrounding this action. Morse states that the underlying litigation history, which Morse maintains constitutes a pattern of behavior, includes a fraud claim brought against one of the largest general contractors in the nation and the president of a large electrical contractor in Chicago; pendency of this litigation for five years; two prior extensions of time to Premier by the court; one prior extension of time to Premier by Morse in response to a family medical situation of Premier's counsel; Premier's repeated failures to file its response brief within the allotted time as extended three times despite representations to the court and defendants' counsel to the contrary; and Premier's request for a fourth extension of time at the January 22, 1992, status conference without written motion or notice to defendants. Defendants assert that this conduct and resulting delay caused prejudice which was continuous to defendants.

Under Supreme Court Rule 183 (134 Ill. 2d R. 183), the trial court may extend the time within which a party may file any pleading provided a showing of good cause has been made. (*Krilich v. Millikin Mortgage Co.* (1990), 196 Ill. App. 3d 554, 554 N.E.2d 422.) More specifically, Supreme Court Rule 183 provides:

"This court, for good cause shown on motion after notice to the opposite party, may extend the time for filing any pleading or the doing of any act which is required by the rules to be done within a limited time, either before or after the expiration of the time." (134 Ill. 2d R. 183.)

The rulings pursuant to Rule 183 are within the trial court's discretion. *Krilich v. Millikin Mortgage Co.*, 196 Ill. App. 3d 554, 554 N.E.2d 422.

■ In the present case, the record reveals a copy of Premier's response which is stamped filed on April 29, 1992. It is clear, based on a review of the record, that Premier filed the response without leave. Attached to it is a list of supporting exhibits, one of which is the Sievert affidavit. Although the affidavit of Carl Sievert, who stated that Sievert Electric had never submitted a bid for the job at issue, is also contained in the record, it is not notarized.

When the trial court denied Premier's motions, it also denied from consideration the affidavits which were attached. Although section 2—1005(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c)) allows the party opposing a summary judgment motion to file counteraffidavits prior to or at the time of the hearing, Levine's affidavit, discussed previously as having been

attached to Premier's emergency motion, merely provided an explanation as to why Premier had not filed its response, but rather was requesting more time and, as such, cannot be considered a counteraffidavit. The Sievert affidavit, on the other hand, can be considered a counteraffidavit for purposes of section 2—1005(c), because its substance attacks the basis of defendants' motion for summary judgment. (*Krilich v. Millikin Mortgage Co.*, 196 Ill. App. 3d 554, 554 N.E.2d 422.) Although at first glance it might appear that Premier's filing of the Sievert affidavit prior to the hearing was proper pursuant to section 2—1005(c), we find that it was not, because the affidavit was not notarized. Moreover, no reason was ever provided as to why Sievert, a Chicago resident, was previously unavailable during the past five years this case was being litigated. As such, we do not find that the trial court erred when it did not consider the Sievert affidavit when ruling on Morse's summary judgment motion.

Premier also asserts that the trial court should not deny a conscientious party its day in court where the matter goes to the merits of the case as in the present case. (*Krych v. Birnbaum* (1978), 66 Ill. App. 3d 469, 384 N.E.2d 52.) It further maintains that "[j]ustice and good conscience may require that a judgment be vacated even though there may have been a lack of due diligence." (*Hiram Walker Distributing Co. v. Williams* (1981), 99 Ill. App. 3d 878, 881, 426 N.E.2d 8, 10.) We find here, however, that the trial court did not abuse its discretion as its decisions to deny Premier's motions were not unfair or unjust. Contrary to Premier's assertion, it was not denied its day in court as it had several opportunities to file its response. Furthermore, when it failed to do so, the trial court informed Premier that it could make its argument at the hearing on defendants' motion for summary judgment. Pursuant to Rule 183, we find that the trial court was justified in finding that Premier had not demonstrated good cause, where in addition it failed to give notice to Morse and the court.

Premier's reliance upon *Olympic Federal v. Witney Development Co.* (1983), 113 Ill. App. 3d 981, 447 N.E.2d 1371, is misplaced as it is distinguishable from the present case. In *Olympic Federal*, the trial court denied the defendant's first request for an extension of time within which to respond to an amended motion of the plaintiff. This court found the trial court's action to be an abuse of its discretion because the defendant was denied due process. In the present case, Premier filed a complaint and was subsequently granted two prior time extensions, before it was denied its third request. In addition, Premier was allowed to present oral argument at the hearing on

defendants' motion for summary judgment. Under these circumstances, it cannot be said that Premier was denied due process or that the trial court abused its discretion.

Finally, we note that Premier is incorrect when it states in its reply brief that defendants maintain that Premier was given four prior extensions of time when in fact Morse states that the number was three and, in actuality, the number was two. Premier is also incorrect in stating that the record shows only two requests for extension of time, those being the motion filed on November 8, 1991, which was granted, and the one made orally on January 22, 1992, which was denied. While these may have been the only requests made to the court, Premier is omitting its request for an extension of time which it made directly to defendants which they agreed to.

In its second contention, Premier asserts that the trial court erred in granting summary judgment in favor of defendants. Premier states that, in its verified complaint, it specifically alleged that defendants acted to defraud it by falsely informing the company that two competing bids, each purportedly $500,000 less than Premier's bid, had been obtained for the project's electrical work and that if Premier did not lower its bid, it would lose the subcontract to one of the two purported "competing bidders." It further states that defendants did not respond with a verified answer as required by section 2—605 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—605), where a plaintiff elects to file a verified complaint. Premier argues that, given the independent eyewitnesses' contradictory testimony set forth in Premier's response, it appears that the potential for a perjury charge dissuaded defendants from signing a verified answer. Whether this is the reason or whether it is merely a simple oversight, Premier contends that defendants' unverified answer is insufficient and the allegations contained in its complaint stand admitted. This being the case, Premier reasons, it follows that Morse's summary judgment must fail even if Premier's response to that motion is not considered. Although aware of the line of cases holding that a verified complaint is generally insufficient to stand against a motion for summary judgment, Premier contends that the absence of a verified answer in this case makes it distinguishable.

Premier further argues that even if the allegations in the verified complaint are disregarded, the facts pleaded by Morse are insufficient to support the motion for summary judgment, where the motion relies on excerpts from deposition transcripts the contents of which are capable of more than one interpretation. Moreover, Premier maintains that much of Morse's documentation recites events that occurred prior to the execution of the contract, constituting

undisputed information that does not have any bearing on the allegation that Morse defrauded Premier. Premier contends that because Morse simply described meetings and used statements taken from deposition transcripts and unverified meeting notes, the supporting documentation contained in Morse's motion was not dispositive of the issues before the court, especially since a juror could draw different and contrary inferences from those documents.

Specifically, Premier contends that Morse did not submit any information which disposed of Premier's claim that there were no genuine competitive bids and that it was misled by Morse's misrepresentation. Maintaining that its allegation as to the Sievert bid remains unchallenged, Premier argues that, although the affidavit from Commercial Light indicates that its bid was genuine, there is no way of knowing what Commercial Light meant by its use of the word "genuine" and that, given the vagueness of that affidavit and the other problems with the testimony, a jury would be entitled to reject that testimony.

In sum, Premier contends that Morse has not disposed of Premier's allegations that Morse defrauded it by means of misrepresentation of phony competitive bids, and that in reliance upon these phony bids, Premier, in response, changed its bid price. Premier asserts that it established all the elements necessary to prove fraud, including the fact that Premier reasonably relied on Morse's misrepresentation of a material fact.

It is well established that summary judgment is properly granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c); *Jones v. Caterpillar Tractor Co.* (1993), 241 Ill. App. 3d 129, 607 N.E.2d 1348.) The trial court, in considering a motion for summary judgment, has the duty to construe the evidence liberally in favor of the nonmoving party and strictly against the moving party. (*In re Estate of Hoover* (1993), 155 Ill. 2d 402, 615 N.E.2d 736.) A genuine issue of material fact is said to exist where material facts are disputed or where they are undisputed but reasonable persons might draw different inferences from them. (*In re Estate of Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736.) Because summary judgment is a drastic measure, it should only be granted when the moving party's right to it is " 'clear and free from doubt.' " *Jones v. Caterpillar Tractor Co.*, 241 Ill. App. 3d at 133, 607 N.E.2d at 1351, quoting *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.

In evaluating the propriety of the trial court's entry of summary

judgment, the proper standard to be applied by the reviewing court is *de novo*. (*Jones v. Caterpillar Tractor Co.*, 241 Ill. App. 3d 129, 607 N.E.2d 1348.) An order granting summary judgment will be reversed by the reviewing court if it finds that a genuine issue of material fact exists. *Jones v. Caterpillar Tractor Co.*, 241 Ill. App. 3d 129, 607 N.E.2d 1348.

Facts contained in an affidavit supporting a motion for summary judgment which remain uncontradicted by counteraffidavit are taken as true for purposes of the motion. (*Tim Thompson, Inc. v. Village of Hinsdale* (1993), 247 Ill. App. 3d 863, 617 N.E.2d 1227.) Generally, "a mere allegation in a complaint will not suffice to overcome the specific contrary averments of an affidavit, and the mere discrepancy between the two will not raise an issue of material fact." *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d at 880, 617 N.E.2d at 1240.

To establish a cause of action for fraudulent misrepresentation, Illinois law requires that the following five elements be present: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *People ex rel. Peters v. Murphy-Knight* (1993), 248 Ill. App. 3d 382, 387, 618 N.E.2d 459, 463.

Facts constituting an alleged fraud must be pleaded with specificity and particularity and must include the representations made as well as when they were made, by whom they were made and to whom they were made. (*People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 618 N.E.2d 459.) "To support an action for fraud, the alleged misrepresentation must be one of fact and not an expression of opinion." (*People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d at 387, 618 N.E.2d at 463.) Statements which pertain to future events are considered opinions and not statements of fact. (*People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 618 N.E.2d 459.) For purposes of determining whether a statement is one of fact or of opinion, the circumstances surrounding a particular case must be examined. *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 618 N.E.2d 459.

Finally, a common law fraud claim requires actual reliance, which means that the misrepresentations must reach the plaintiff, who must reasonably rely on them. *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 618 N.E.2d 459.

Turning to the present case, we first address Premier's argument that Morse's answer is insufficient to rebut the allegations contained

in Premier's complaint because it is unverified, but note that Premier offers no authority to support its claim.

A close look at section 2—605(a) of the Code reveals that if any pleading is verified, every subsequent pleading must also be verified. The statute also provides, however, that such verification may be excused by the court. (Ill. Rev. Stat. 1991, ch. 110, par. 2—605(a).) In addition, section 2—605(a) provides that "[v]erified allegations do not constitute evidence except by way of admission." Ill. Rev. Stat. 1991, ch. 110, par. 2—605(a).

Applying *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d 863, 617 N.E.2d 1227, to the facts of this case, we find that any allegations contained in Premier's complaint would be insufficient to overcome the specific averments to the contrary contained in Dolan's affidavit, which was attached to Morse's motion for summary judgment, and any discrepancy between the two would not rise to the level of a genuine issue of material fact. This, coupled with the fact that verification is within the trial court's discretion, leads us to conclude that Premier's argument is unpersuasive and without merit.

■ Morse produced the affidavit of Dolan to prove that Commercial Light submitted a $4.3 million bid for the electrical work on the project. Premier, however, offered no counteraffidavit or other evidence contradicting Dolan's affidavit. Furthermore, Premier took the sworn deposition of Dolan during which he confirmed that he prepared a written, genuine bid in the amount of $4.3 million. His testimony remains undisputed, where Gustafson, a witness to O'Boyle's alleged admission of fraud, was uncertain as to whether Commercial Light was one of the companies from which O'Boyle obtained a purported phony bid.

Furthermore, because Sievert's affidavit was properly excluded, as noted previously, Premier offered no counteraffidavits that give rise to a relevant issue of fact.

More importantly, the undisputed facts show that Premier did not lower its bid in reliance on the two lower bids which it learned of at the January 7, 1981, meeting. Rather, Hughes and Boyko both testified that they reduced Premier's $4.8 million bid to $4.3 million because of their agreement with Morse to change the scope of Premier's work and the length of their construction schedule from 24 to 18 months.

Moreover, Boyko testified that after the January 7, 1981, meeting, he and Hughes discussed Premier's estimate of $4.8 million, reaching the conclusion that the electrical work could be done for $4.3 million with some qualifications and that it was a reasonable price for which to perform the work. After making the revisions to the contract, Boyko sent Premier's final bid to Morse on January 9, 1981.

Premier has not refuted that these undisputed contract changes are the reason that prompted the company to reduce its bid price. Any possible misrepresentation could not have been material based on the testimony of Premier's employees and business records. Therefore, we find that Premier cannot now claim that had it not been for the alleged material misrepresentation, it would not have lowered its bid.

Furthermore, Premier has not demonstrated that its reliance upon the alleged misrepresentation was justified. Considering the circumstances surrounding the alleged misrepresentation, as well as the nature of the business, we cannot say that Premier was entitled to rely on the fact that lower bids were obtained by Morse from other contractors. Premier's representatives were experienced electrical contractors negotiating a subcontract in excess of $4 million in an industry where it is common practice for the owner or general contractor to obtain complimentary bids in an effort to evaluate the prices of competing bids.

On January 7, 1981, Hughes asked to see the two lower competitive bids, and this information was provided. The subcontract, however, was not entered into until February 19, 1981, allowing Premier ample opportunity to evaluate these other bids and to verify their genuineness, accuracy and scope. The representations made were not subjective in nature or difficult to prove; rather, they were objective, quantifiable and verifiable. (See *People ex rel. Peters v. Murphy-Knight*, 248 Ill. App. 3d 382, 618 N.E.2d 459.) Premier failed to investigate and, as a result, cannot now claim to have justifiably relied, especially when Hughes' and Boyko's access to information and extensive experience negotiating multimillion dollar electrical contracts is taken into consideration.

We therefore find, based on a review of the record, that the pleadings, depositions, affidavits and oral argument before the trial court reveal that Premier did not satisfy the five elements of common law fraud in Illinois and that there were no genuine issues of material fact. Consequently, the trial court did not err when it granted summary judgment in favor of Morse.

Lastly, we consider Morse's contention on cross-appeal that the trial court erred in denying its motion to tax costs. The trial court entered its judgment in this case on April 30, 1992. On May 29, 1992, Premier filed its notice of appeal. On that same date, Morse filed a motion to tax costs, pursuant to section 5—110 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 5—110) and Illinois Supreme Court Rule 208(d) (134 Ill. 2d R. 208(d)). Premier subsequently filed a motion to reset the September 29, 1992, hearing date on Morse's motion to tax costs.

At the September 21, 1992, hearing on Premier's motion to reset hearing date, the trial court found that it did not have jurisdiction to hear the motion on its merits since a notice of appeal had been filed in the case. Consequently, the trial court denied Premier's motion and struck Morse's motion to tax costs.

Morse contends that Premier's filing of a notice of appeal in this case did not remove the trial court's jurisdiction. It therefore asserts that the trial court erred in finding that it did not have jurisdiction to decide its post-trial motion to tax costs where its motion and memorandum of law for summary judgment were necessarily supported by the deposition testimony for which it seeks to recover costs. Morse asserts that the expenses for the nine depositions listed in its motion to tax costs were required to defend Premier's fraud allegations which were based solely on oral statements. Stating that depositions in support of a summary judgment motion, similar to affidavits, are substitutes for testimony in open court, Morse contends that the nine depositions were indispensable to the successful defense of Premier's complaint, and, therefore, their costs are properly taxable against Premier. We disagree.

Premier does not contest that the trial court had jurisdiction to rule on Morse's motion to tax costs. Rather, it contends that the transcript shows only that it requested that the matter be reset, not dismissed. However, Premier contests the costs now, as it did then, but notes that if this court grants the relief it requests on appeal, then this issue will be moot.

At common law, a successful litigant was not allowed to recover from his opponent the costs of his litigation. (*Gleason v. Carter* (1991), 212 Ill. App. 3d 206, 570 N.E.2d 1196.) Therefore, before costs can be allocated to the losing party, there must be statutory authority, and any assessed costs are limited to those specifically allowed by statute. (*Gleason v. Carter*, 212 Ill. App. 3d 206, 570 N.E.2d 1196.) "While the power to impose costs must ultimately be found in some statute, the General Assembly may grant the power in general terms to the courts, which may in turn make rules or orders under which costs may be taxed and imposed." (*Gebelein v. Blumfield* (1992), 231 Ill. App. 3d 1011, 1013, 597 N.E.2d 265, 267.) More specifically, under section 1—105 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 1—105), the supreme court, by rule, may provide for the assessment of costs. On review, the award of costs will not be disturbed absent a clear abuse of the trial court's discretion. *Gleason v. Carter*, 212 Ill. App. 3d 206, 570 N.E.2d 1196.

Section 5—110 of the Code provides in pertinent part:

"If in any action, judgment upon any motion directed to the

complaint, answer or reply, by either party to the action, is entered against the plaintiff, the defendant shall recover costs against the plaintiff." (Ill. Rev. Stat. 1991, ch. 110, par. 5—110.) In addition, under Supreme Court Rule 208(d), the expenses incurred in taking, transcribing and filing depositions may in the discretion of the trial court be taxed as costs. 134 Ill. 2d R. 208(d).

In *Galowich v. Beech Aircraft Corp.* (1982), 92 Ill. 2d 157, 441 N.E.2d 318, the supreme court interpreted Rule 208(d) " 'as authorizing the trial court to tax as costs, in its discretion, the expenses only of those depositions necessarily used at trial.' " (Emphasis omitted.) *(Gleason v. Carter*, 212 Ill. App. 3d at 208, 570 N.E.2d at 1197-98, quoting *Galowich v. Beech Aircraft Corp.*, 92 Ill. 2d at 166, 441 N.E.2d at 322.) The supreme court in *Galowich* gave, as one of its policy reasons for limiting the discretion of a trial court to tax deposition costs against an opponent, the fact that it wanted to prevent parties from taking unnecessary discovery depositions and then forcing the opposing party to pay for them under Rule 208(d). *Gleason v. Carter*, 212 Ill. App. 3d 206, 570 N.E.2d 1196.

■ Turning to the present case, we find that the filing of a notice of appeal transfers jurisdiction from the trial court to the appellate court with regard to the matters involved in the appeal. However, we also find that the filing of a notice of appeal in the underlying action does not affect the trial court's jurisdiction to consider a post-judgment motion. Therefore, we hold that the trial court in this case did have jurisdiction to hear, on its merits, Morse's motion to tax costs.

However, the nine depositions listed in Morse's motion to tax costs were not necessary for use at trial because there was no trial. Therefore, according to *Galowich*, Premier cannot be taxed with the costs of Morse's discovery depositions. Although the present case involves a motion for summary judgment, rather than a voluntary dismissal as in *Galowich*, we nevertheless find the supreme court's reasoning in *Galowich* to be applicable.

Moreover, we note that only three of the nine depositions were actually cited in Morse's motion for summary judgment. Based on the above, we conclude that although the trial court erred in finding that it did not have jurisdiction to hear the motion to tax costs on its merits, the error is harmless.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RAKOWSKI and GIANNIS, JJ., concur.